IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHANIE COLEMAN, et al.,           :
                                     :     CIVIL ACTION
            Plaintiffs,              :
                                     :     NO. 09-679
            v.                       :
                                     :
COMMONWEALTH LAND                    :
TITLE INSURANCE CO.,                 :
                                     :
            Defendant.               :

## OPINION

Slomsky, J.                                          January 14, 2010

## TABLE OF CONTENTS

I.      Introduction...............................................................................................................2

II.     Factual Background....................................................................................................3
        A.      The Rate Manual in Pennsylvania.........................................................4
        B.      Coleman Transaction................................................................................7
        C.      Bowmer Transaction................................................................................7
        D.      The Scheme to Defraud...........................................................................8

III.    Standard of Review......................................................................................................9

IV.     Discussion...................................................................................................................10
        A.      § 910-44(b) of TICA Does Not Bar Plaintiffs From Pursuing a Private Right of
                Action Before Exhausting Administrative Remedies.............................................10
        B.      Plaintiffs State a Valid RICO Claim......................................................14
                I.      The Association-in-Fact Enterprise
                        and the Distinctiveness Requirements........................................16
                        a.      Plaintiffs Sufficiently Allege a "Person"
                                Distinct From the "Enterprise"...........................................17
                        b.      Plaintiffs Sufficiently Allege an
                                Organized "Enterprise" Structure.....................................21
                        c.      Plaintiffs Sufficiently Allege an "Enterprise" Distinct
                                From the Pattern of Racketeering Activity......................................23
                II.     Plaintiffs Sufficiently Allege Predicate Acts of Mail and Wire Fraud........25
                        a.      The Scheme to Defraud..................................................26
                                i.      The HUD-1 Statement Furthers the Scheme to Defraud.....27
                                ii.     Defendant Owed Plaintiffs a Duty to Disclose....................29

|  | b. | Use of Mail or Wires.......................................................................30 |
|  | c. | Fraudulent Intent............................................................................31 |
|  | III. | Plaintiffs' Claim is Not Pre-empted by the McCarran-Ferguson Act............32 |
| C. | Plaintiffs Assert a Viable Claim Under UTPCPL..................................................32 |
| D. | Plaintiffs' Remaining Claims May Proceed...........................................................35 |
|  | I. | Fraudulent Misrepresentation........................................................35 |
|  | II. | Negligence.........................................................................................35 |
|  | III. | Unjust Enrichment..........................................................................37 |

V. Conclusion.....................................................................................................................37

## I. INTRODUCTION

Before the Court is a case arising from an alleged fraudulent scheme in which Defendant Commonwealth Land Title Insurance Company ("Commonwealth Land"), through various title agents, misrepresented the amount of money due and owing for title insurance.[1]  The crux of Plaintiffs' allegations is that Defendant overcharged thousands of Pennsylvania homeowners who purchased title insurance by charging a default "basic" rate of insurance rather than a special discounted "reissue" or "refinance" rate, which applied to the kind of title insurance required of a homeowner as part of a mortgage transaction.  Through this alleged scheme, Defendant received considerable revenue to which it was not entitled.

---

[1]Also before this Court are two related cases, <u>Schwartz v. Lawyers Title Insurance Company</u>, Civil Action No. 09-841, and <u>Levine v. First American Title Insurance Company</u>, Civil Action No. 09-842, in which similar claims are made.  Plaintiffs in all three cases are represented by the same counsel.  The Court notes that defense counsel in <u>Levine</u> collaborated with defense counsel in the present case.  The Court has issued three similar opinions in these cases, changing only the factual averments and the names of the parties in appropriate places.

Plaintiffs, individually and on behalf of others similarly situated, commenced this action on February 18, 2009. An Amended Complaint (Doc. No. 22) was filed on June 15, 2009.[2] Plaintiffs allege in the Amended Complaint that Defendant, through its title agents, engaged in the scheme described above as part of an ongoing racketeering enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Additionally, Plaintiffs claim Defendant employed unfair or deceptive acts prohibited by the Pennsylvania Unfair Trade Practices Act and Consumer Protection Law ("UTPCPL"). Plaintiffs also assert claims of fraudulent misrepresentation, negligence, and unjust enrichment, which stem from the RICO and UTPCPL counts.

Currently before the Court is Defendant Commonwealth Land's Motion to Dismiss Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), filed July 20, 2009 (Doc. No. 25). Plaintiffs filed their Opposition in Response to Motion to Dismiss on August 24, 2009 (Doc. No. 26). On September 3, 2009, Commonwealth Land filed a Reply in Support of the Motion to Dismiss (Doc. No. 28). On October 7, 2009, the Court held a hearing on Defendant's Motion. For reasons that follow, the Court will deny the Motion to Dismiss in its entirety.

## II.    FACTUAL BACKGROUND

This case is one of many cases brought against title insurance companies in which allegations are made of a pervasive pattern of overcharging for title insurance inconsistent with statutory rates. The parties cite and discuss several certified class actions filed within the last few years in which

---

[2]Plaintiffs include Stephanie Coleman ("Plaintiff Coleman") and Janelle Bowmer ("Plaintiff Bowmer") (collectively "Plaintiffs"). Plaintiffs bring this suit as a class action pursuant to Federal Rule of Civil Procedure 23. (Pl. Am. Compl., ¶8.) No class has been certified as of the filing of this Opinion.

homeowners allegedly were overcharged for title insurance in Pennsylvania. The three related cases presently before this Court involve three separate title insurance companies. Individual plaintiffs in each case are different. However, each suit alleges the same basic grievance: unbeknownst to insurance purchasers, title insurance companies systematically misrepresented the amount of money due and owing for title insurance by failing to disclose that purchasers who paid an overcharged amount at settlement were entitled to a discounted rate based on the history of the property being insured.

A. The Rate Manual in Pennsylvania

In Pennsylvania, title insurance rates are regulated by the Title Insurance Companies Act, 40 P.S. § 910 (1999) ("TICA"). TICA requires that title insurance rates be approved by and filed with the Insurance Commissioner of the Commonwealth of Pennsylvania. 40 P.S. § 910-37(a). As a title insurance company selling title insurance in Pennsylvania, Defendant is obligated not to "charge any fee for any policy or contract of title insurance except in accordance with filings or rates which are in effect for said title insurance company." 40 P.S. § 910-37(h). Defendant has received approval for its rates as a member of Title Insurance Rating Bureau of Pennsylvania ("TIRBOP"), an agency licensed by the Pennsylvania Insurance Department. (Pl. Am. Compl., ¶ 26.) TIRBOP publishes title insurance rates in a Manual ("Manual"). The Manual sets forth a schedule of rates for members of TIRBOP and is filed with and approved by the Pennsylvania Insurance Department in accordance with the Insurance Company Law of 1921, 40 P.S. § 910-41. As a member of TIRBOP, Defendant is required to abide by the rates set forth in the TIRBOP Manual. (Id.) The TIRBOP introduction states:

The provisions of this Manual are binding upon all members and subscribers of TIRBOP and their agents and must be used on and after the effective date hereof unless a specific deviation from this Manual has been filed by an individual member or subscriber company with, and approved by, the Pennsylvania Insurance Department.

Section 2.1 of the Manual, as amended through August 1, 2005, requires that "[a]ll Charges for title insurance coverage provided by the approved policies and endorsements must be made as set forth in this Manual."

Title insurance companies and title agents calculate a prospective purchaser's rate depending on the amount of the loan and the last date on which title insurance was purchased for the property. (Id. at ¶27.) There are three possible rates - Basic Rate, Reissue Rate, and Refinance Rate. The default Basic Rate is the highest allowable rate for title insurance and is described in Section 5.50 of the Manual. (Id. at ¶28.) Certain purchasers, however, qualify for a special discounted rate if title insurance had been purchased for the property within the previous ten (10) years. (Id.) Depending on when the purchaser previously bought title insurance, the purchaser is eligible for the Reissue Rate (90% of the Basic Rate) or the Refinance Rate (80% or 70% of the Reissue Rate). (Id. at ¶¶29-31.)

Prior to August 1, 2005, under the TIRBOP Manual, purchasers of title insurance had the burden to provide evidence of an earlier title insurance policy in order to trigger the special discounted rate. (Id. at ¶32.) The Manual was amended in 2005 and placed the burden on the title insurer or its agent to conduct a title search on the property, which included an investigation of the existence of prior title insurance, and to issue the insurance rate based on the findings. Plaintiffs argue that as of August 1, 2005, the purchaser no longer had the burden to provide affirmative

evidence of a previous policy.  (Id. at ¶36.)  The Manual, as amended on August 1, 2005, contained

revisions to Sections 5.3 (REISSUE RATE) and 5.6 (REFINANCE AND SUBSTITUTION

LOANS), and added a new section, 2.8.  Sections 2.8, 2.9, 5.3, and 5.6 now provide as follows:

> 2.8     Sections 5.3, 5.4 and 5.6 of this Manual provide that reduced rates are applicable when evidence of previous insurance is provided within a specific period of time. As evidence of previous insurance, an Insurer shall rely upon:
> (a) the recording (within the period of time specified within the applicable Section of the Manual) of either:
> (1) a deed to a bona fide purchaser for value, or
> (2) an unsatisfied mortgage to an institutional lender

. . .

> 2.9     A written notice must be provided to every purchaser of a title insurance policy at or prior to closing, which shall be signed by or on behalf of the purchaser of the title insurance policy, and shall include language substantially in the following form:
>
>> IF THIS CONVEYANCE OR REFINANCE OCCURS WITHIN TEN YEARS OF A PREVIOUS INSURANCE OF THE SAME PROPERTY, YOU MAY BE ENTITLED TO A REDUCED RATE.

. . .

> 5.3     REISSUE RATE
>
> A purchaser of a title insurance policy shall be entitled to the reissue rate if the real property to be insured is identical to, or is part of, real property insured 10 years immediately prior to the date the insured transaction closes.  Evidence of previous insurance in accordance with the provisions of Section 2.8 of this Manual must be considered in order to apply the reissue rate.  Insurer shall comply with the written notice provisions of Section 2.9.

. . .

> 5.6     REFINANCE AND SUBSTITUTION LOANS
>
> When a refinance or substitution loan is made within 3 years from the date of closing of a previously insured mortgage or fee interest and the premises to be insured are identical to, or part of, the real property previously insured, and there has been no change in the fee simple ownership, the Charge shall be 80% of the reissue rate. Evidence of previous insurance in accordance with the provisions of Section 2.8 of this Manual must be considered in order to apply this Charge.  Insurer shall comply with the written notice provisions of Section 2.9.

6

The actual rate charged appears on the HUD-1 Settlement Statement that owners and/or buyers of property sign at either a settlement when title to real estate is transferred to a buyer or at a mortgage refinance closing.  (Id. at ¶24.)

B.  Coleman Transaction

In July 2005, Plaintiff Coleman refinanced the mortgage on her home and purchased title insurance.  (Id. at ¶40; Ex. A.)  In December 2006, Plaintiff Coleman refinanced her mortgage a second time and purchased title insurance from Commonwealth Land at closing.  (Id. at ¶3.)  Involved in this closing were NovaStar Mortgage, Inc. ("NovaStar"), which made the loan to Plaintiff, and Brokers Settlement Services ("Brokers").  (Id. at ¶53(a).)  Brokers maintained dual roles throughout the closing transaction as title agent and settlement agent.  (Id.)  Plaintiff Coleman paid $1,260.88 for the new insurance.  (Id.; Ex. B).  Plaintiff alleges that she should have been charged the discounted Refinance Rate, or $848.70, rather than the undiscounted amount.  (Id. at ¶41.)

C.  Bowmer Transaction

In January 2006, Plaintiff Bowmer also refinanced the mortgage on her home through NovaStar.  (Id. at ¶44; Ex. C.)  Madison Title Agency, LLC ("Madison") participated in the closing on the loan as both title agent and settlement agent, and Bowmer purchased title insurance from Commonwealth Land.  (Id. at ¶53(b).)  The HUD-1 settlement statement listed the title insurance premium paid as $918.75.  (Id.; Ex. D.)  Bowmer alleges she was overcharged because she was entitled to the discount rate based on a prior refinancing and purchase of title insurance.  Bowmer claims that the correct rate should have been $660.06  (Id. at ¶45) or $658.46 (Id. at ¶53(b).)

D.  The Scheme to Defraud.

The Amended Complaint describes a scheme to defraud that begins when title insurance is applied for and ends when funds are disbursed to the title insurance company at settlement.  The Amended Complaint alleges that the relationship between Commonwealth Land and each title agent is governed by an agency agreement.  (Id. at ¶60.)  The agreement states the conditions under which the title agent is authorized to issue title insurance on behalf of Commonwealth Land.  (Id.)  Title agents are authorized to act as settlement agents at a closing, to conduct closings of refinance transactions on behalf of Defendant, to prepare relevant documents on behalf of Defendant, and to collect the premium for the benefit of Defendant.  (Id. at ¶104.)  As noted, this case charges that Defendant and its agents engaged in a fraudulent scheme by deliberately misrepresenting the correct amount of money due and owing for title insurance, misappropriating the overcharges, and failing to disclose to purchasers of title insurance that they were entitled to discounts if the property was refinanced and title insurance was purchased within ten years.  (Id. at ¶1.)

Based upon the facts underlying the scheme, Plaintiffs assert five claims against Commonwealth Land.  Count One of the Amended Complaint alleges a RICO violation with mail and wire fraud as the predicate offenses.  Count Two alleges deceptive and fraudulent conduct under the UTPCPL.  Plaintiffs assert a common law fraudulent misrepresentation claim in Count Three.  In Count Four, Plaintiffs allege, in the alternative, that Commonwealth Land negligently failed to apply the appropriate title insurance rate and negligently failed to adequately supervise the title agents with whom Defendant contracted.  Finally, Count Five claims unjust enrichment on the part of Defendant.

## III.    STANDARD OF REVIEW

Commonwealth Land has moved to dismiss all claims for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  In deciding a Motion to Dismiss pursuant to Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under a reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (reasoning that this statement of the Rule 12(b)(6) standard remains acceptable following U.S. Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) (internal quotations omitted)).

To withstand a Motion to Dismiss under Rule 12(b)(6), "factual allegations must be enough to raise a right to relief above the speculative level."  Phillips, 515 F.3d at 234.  When a complaint contains well-pleaded factual allegations, "a court should assume their veracity and determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009) (reaffirming rationale set forth in Twombly).  However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation."  Id. at 1949.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice."  Id.  In other words, a complaint has to "show" an entitlement to relief with its facts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009).  See also  McTernan v. City of York, 577 F.3d 521, 532 (3d Cir. 2009) (examining Iqbal's requirement for a complaint to state a plausible claim of relief to survive a Motion to Dismiss).

# IV.    DISCUSSION

The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (2006) and 18 U.S.C. § 1964 (2000) since Plaintiffs' claims arise under RICO, 18 U.S.C. §§ 1961-1968 (2000).  The Court has jurisdiction over the Pennsylvania law and common law class claims pursuant to the Class Action Fairness Act, 28 U.S.C.A. § 1453 (2006), because there is diversity of citizenship and the amount in controversy exceeds $5,000,000, 28 U.S.C.A. § 1332(d)(2), and pursuant to the Court's supplemental jurisdiction, 28 U.S.C.A. § 1367 (2006).

### A.   § 910-44(b) of TICA Does Not Bar Plaintiffs From Pursuing a Private Right of Action Before Exhausting Administrative Remedies.

As a threshold matter, Defendant moves to dismiss the Amended Complaint because Plaintiffs have not exhausted administrative remedies provided in TICA prior to filing this suit. Commonwealth Land argues that § 910-44(b) of TICA provides a statutory remedy which must be pursued first by any person aggrieved by the application of the title insurer's rating system.  Recent developments in Pennsylvania appellate law, however, are contrary to the position of Defendant.

This matter is, in part, a diversity of jurisdiction case.  In a diversity case, this Court must apply the substantive law of Pennsylvania.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78-79 (1938); State Auto Prop. & Cas. Ins. Co. v. Pro Design, P.C., 566 F.3d 86, 89 (3d Cir. 2009).  Ideally, the Court would simply apply Pennsylvania Supreme Court precedent that is on point.  However, the Pennsylvania Supreme Court has not yet determined whether § 910-44(b) creates an exclusive remedy that must be exhausted by Plaintiffs before filing a case in court.  Consequently, this Court must predict how the Supreme Court would rule on the issue.  Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 45-46 (3d Cir. 2009) ("In the absence of a controlling decision by the Pennsylvania

Supreme Court, a federal court applying that state's substantive law must predict how Pennsylvania's highest court would decide this case."). In doing so, this Court "must look to decisions of state intermediate appellate courts, of federal courts interpreting the state's law, and of other state supreme courts that have addressed the issue," as well as "dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." Norfolk Southern Ry. Co. v. Basell USA, Inc., 512 F.3d 86, 92 (3d Cir. 2008) (quoting Koppers Co., Inc. v. Aetna Cas. and Sur. Co., 98 F.3d 1440, 1445 (3d Cir. 1996)); see also Jewelcor, Inc. v. Karfunkel, 517 F.3d 672, 676 (3d Cir. 2008) ("In diversity cases, 'where the applicable rule of decision is the state law, it is the duty of the federal court to ascertain and apply that law, even though it has not been expounded by the highest court of the state.'") (internal quotations omitted).

On October 2, 2009, the Pennsylvania Superior Court decided White v. Conestoga Title Ins. Co., which considered whether TICA provides a statutory remedy which must be exhausted prior to filing a private cause of action in court. 982 A.2d 997 (Pa. Super. Ct. 2009). In White, the Superior Court reversed the trial court's dismissal of plaintiff's claims for failure to exhaust administrative remedies under § 910-44(b). White was decided five days before a hearing on the Motion to Dismiss presently before this Court and essentially clears the landscape, at this point, of § 910-44(b) jurisprudence.[3] Accordingly, this Court must give due deference to the White opinion when forecasting the position that the Pennsylvania Supreme Court would take on this issue. See Travelers Indem. Co. of Ill. v. DiBartolo, 131 F.3d 343, 348 (3d Cir. 1997) (finding that "[a]pplicable decisions of the Superior Court must be accorded significant weight" when predicting

---

[3]A petition for reargument in White was denied on November 23, 2009.

how the Pennsylvania Supreme Court would rule).

In <u>White</u>, plaintiff purchased title insurance from Conestoga Title Insurance Company ("Conestoga") while refinancing her home. Similar to the argument of Plaintiffs in the present action, White contended that Conestoga, through its title agents, failed to apply the discounted title insurance rate to which she was entitled under the TIRBOP rate structure. White claimed, *inter alia*, that Conestoga's systematic practice violated the UTPCPL.[4] <u>White</u>, 982 A.2d at 1000-01.

The Court of Common Pleas dismissed White's complaint with prejudice for failure to exhaust the statutory remedy set forth in TICA before instituting a private cause of action with respect to her overcharge claim.[5] <u>Id.</u> at 1001. In resolving the exhaustion dispute, the Superior Court discussed the concept of exhaustion contained in the Statutory Construction Act, 1 PA. Cons. Stat. Ann. § 1504 (2008). The court noted that the "administrative remedy must only be exhausted where the Legislature provides an exclusive and specific method for resolution of a claim, and where the statutory remedy is adequate." <u>Id.</u> at 1000. In determining whether TICA provides an exclusive and adequate remedy, the Superior Court relied on legislative intent. <u>See</u> <u>Jackson v. Centennial School Dist.</u>, 501 A.2d 218, 219 (Pa. 1985) ("In essence, the key to our analysis is the clear legislative intent to confine the role of the judiciary to one of review of an administrative process."). Comparing

---

[4]Unlike the present case, however, White did not assert a RICO claim. Plaintiffs' counsel in this case acknowledged at oral argument that the three related matters before the Court are the first title insurance cases involving rate discrepancies in which a RICO violation is alleged in the Complaint.

[5]White's appeal was consolidated with <u>Uyehara v. Guarantee Title and Trust Co.</u>, 2008 WL 2227295 (Pa. Com. Pl. 2008). The Superior Court de-consolidated the appeal and dismissed <u>Uyehara</u> due to the liquidation of Guarantee Title. Consequently, the Superior Court only reviewed White's appeal. <u>Id.</u> at 1001 n.3.

TICA to the Unfair Insurance Practices Act, 40 P.S. § 1171.1, *et seq*. (1999) ("UIPA"), which was designed to regulate potential unfair practices in the insurance industry, the court concluded that neither statute was intended to provide an exclusive administrative remedy. See also Pekular v. Eich, 513 A.2d 427, 430 (Pa. Super. Ct. 1986) (finding that UIPA does not provide an exclusive administrative remedy). Significantly, in White, the Pennsylvania Insurance Commissioner filed an *amicus curiae* brief and agreed with plaintiff that "TICA does not provide an exclusive remedy that must be exhausted before seeking private action." White, 982 A.2d at 1005.

Prior to the Superior Court's ruling in White, Defendant, in its Motion to Dismiss, relied heavily on two recent Eastern District of Pennsylvania decisions that held that TICA provided an exclusive administrative remedy that must be exhausted prior to filing a private cause of action. See Amato v. United Gen. Title Ins. Co., No. 08-3423, 2009 WL 691983 (E.D. Pa. Mar. 17, 2009) appeal docketed, No. 09-2416 (3d Cir. May 20, 2009) and McDuffie v. Stewart Title Guar. Co., (E.D. Pa. Mar. 30, 2009), appeal docketed, No. 09-2414 (3d Cir. May 15, 2009). Both decisions granted Defendant title insurance companies' Motions to Dismiss. However, both courts relied on the Court of Common Pleas holding in White, which has since been reversed. Consequently, this Court agrees with Plaintiffs that Amato and McDuffie should not be relied upon in deciding the instant Motion to Dismiss.

Even before White, however, courts in the Eastern District of Pennsylvania held that TICA does not provide an exclusive remedy for claims akin to those of White, Coleman, and Bowmer. See Cohen v. Chicago Title Ins. Co., No. 06-873, 2006 WL 1582320 (E.D. Pa. June 5, 2006) (rejecting defendant's Motion to Dismiss for failure to exhaust administrative remedies under TICA); Guizzari v. Ticor Title Ins. Co., No. 06-4630, 2007 WL 756722 (E.D. Pa. Mar. 8, 2007) (relying on Cohen

in rejecting defendant's argument that TICA provides an exclusive administrative remedy); O'Day

v. Ticor Title Ins. Co. of Fl., No. 06-4660, 2007 WL 756719 (E.D. Pa. Mar. 8, 2007) (same);

Markocki v. Old Republic Nat. Title Ins. Co., 527 F. Supp.2d 413 (E.D. Pa. 2007) (Markocki I)

(holding that plaintiff need not exhaust administrative remedies prior to filing TICA claim under

UTPCPL).

Consequently, TICA does not provide an exclusive statutory remedy which must be

exhausted by a plaintiff prior to filing a private cause of action against a title insurance company.

### B. Plaintiffs State a Valid RICO Claim.

In Count One, Plaintiffs allege that Defendant violated the civil RICO statute, 18 U.S.C.

§ 1962(c).[6] Section 1962(c) of RICO provides as follows:

> It shall be unlawful for any person employed by or associated with
> any enterprise engaged in, or the activities of which affect, interstate
> or foreign commerce, to conduct or participate, directly or indirectly,
> in the conduct of such enterprise's affairs through a pattern of
> racketeering activity....

18 U.S.C. § 1962(c) (2000). To state a claim under § 1962(c), Plaintiffs must allege that a "person"

employed by or associated with an enterprise engaged in the following: "(1) conduct (2) of an

---

[6]Though Congress created RICO in 1970 to prosecute organized criminal conduct, courts
have refused to adopt a narrow construction of civil RICO. In Tabas v. Tabas, 47 F.3d 1280,
1296-97 (3d Cir. 1995), the court explained, "We recognize that our ruling means that RICO,
with its severe penalties, may be applicable to many 'garden variety' fraud cases...particularly
considering the judiciary's broad interpretation of the mail fraud statute...We are bound,
however, by the language of RICO itself and the Supreme Court's instruction that 'RICO is to be
read broadly.'" (quoting Sedima S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 497-98 (1985)).
RICO is to be "liberally construed to effectuate its remedial purposes." Pub. L. 91-452 § 904(a),
84 Stat. 947.

enterprise (3) through a pattern (4) of racketeering activity." <u>Camiolo v. State Farm Fire & Cas. Co.</u>, 334 F.3d 345, 364 (3d Cir. 2003) (quoting <u>Sedima</u>, 473 U.S. at 496).

RICO defines a "person" as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). A corporation can qualify as a "person" for RICO purposes if that corporation has conducted an enterprise's affairs through a pattern of racketeering activity. <u>Lorenz v. CSX Corp.</u>, 1 F.3d 1406, 1412 (3d Cir. 1993); <u>United States v. Philip Morris USA, Inc.</u>, 566 F.3d 1095, 1110 (D.C. 2009).

"'Enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). It is well-settled that an "association-in-fact" enterprise may consist of a corporation together with non-employee individuals. <u>R.R. Brittingham v. Mobil Corp.</u>, 943 F.2d 297, 302 (3d Cir. 1991); <u>see also</u>, n.19, *infra*. "For the purposes of pleading, a corporation may be both a defendant 'person' and part of an association-in-fact enterprise." <u>Crown Cork & Seal Co. Inc. v. Ascah</u>, No. 93-2933, 1994 WL 57217, *4 (E.D. Pa. Feb. 18, 1994). Finally, a RICO enterprise "may be comprised only of defendants, or of defendants and non-defendants." <u>United States v. Urban</u>, 404 F.3d 754, 782 (3d Cir. 2005).

Racketeering activity is defined in Section 1961(1) to include acts indictable under certain provisions of the federal crimes code. Mail and wire fraud under 18 U.S.C. §§ 1341 and 1343 are included. A pattern of racketeering activity requires at least two acts of racketeering. § 1961(5). Plaintiffs allege predicate acts of racketeering activity involving fraud, which triggers the pleading requirements of Federal Rule of Civil Procedure 9(b). Under 9(b), a court must decide if plaintiff

has plead with particularity the "circumstances" of the alleged fraud "in order to place defendants on notice of the precise misconduct with which they are charged, and to safeguard against spurious charges of immoral and fraudulent behavior." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984); see also Banks v. Wolk, 918 F.2d 418, 422 n.1 (3d Cir. 1990) (finding that blanket allegations of mail and wire fraud without information of who made or received the fraudulent representations are insufficient to satisfy 9(b)); Lum v. Bank of America, 361 F.3d 217, 223-24 (3d Cir. 2004) (requiring some means of precision when pleading fraudulent circumstances, such as date, place, or time of fraud).

Construing the Amended Complaint in a light most favorable to Plaintiffs, and assuming all facts in the Amended Complaint to be true, the Court finds that Plaintiffs have provided sufficient facts to establish all elements of a valid RICO claim.

## I. The Association-in-Fact Enterprise and the Distinctiveness Requirements.

In the Motion to Dismiss, Defendant argues that Plaintiffs have failed to state a RICO claim because Plaintiffs did not plead a valid "association-in-fact" enterprise. (Def. Mot. to Dismiss, 22). Defendant's chief argument is that the Amended Complaint does not satisfy the "distinctiveness" requirement of RICO as explained in copious federal case law. To satisfy the "distinctiveness" requirement under § 1962(c), Plaintiffs must allege that the RICO "enterprise" is distinct from the Defendant "person" alleged to have violated RICO and that the "enterprise" is distinct from the alleged pattern of racketeering activity. For the reasons that follow, the Court finds that Plaintiffs have satisfied the "distinctiveness" requirements and have alleged a valid "association-in-fact" enterprise.

### a. Plaintiffs Sufficiently Allege a "Person" Distinct From the "Enterprise."

The United States Supreme Court has held that "to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). In other words, Defendant must be the "person" who conducts the "enterprise's" affairs through a pattern of racketeering activity, and the person/defendant must be separate and distinct from the "enterprise." Phillip Morris, 556 F.3d at 1110.

Plaintiffs maintain in the Amended Complaint and in the RICO Case Statement (Doc. No. 32) that Defendant is the liable "person" and the "enterprise" is an association-in-fact between Defendant and its title agents in Pennsylvania. The Court may consider a RICO Case Statement in assessing the merits of Plaintiffs' RICO claims. De Lage Landen Fin'l Servs. v. Rasa Floors, LP, No. 08-533, 2009 WL 564627, *10 (E.D. Pa. Mar. 5, 2009). Plaintiffs claim that Brokers and Madison, Defendant's title and settlement agent in transactions with Plaintiffs, worked with and assisted Defendant Commonwealth Land in misrepresenting the amount due and owing for title insurance and misappropriating the overcharges. (Pl. Am. Compl. ¶61.) Plaintiffs describe the structure, purpose, functions, and course of conduct of the enterprise as follows:

> Commonwealth is the principal in the enterprise and has the responsibility for providing title insurance policies. The Title Agents act as Commonwealth's agents in selling title insurance policies and often act as closing agents for the lenders in the same mortgage transactions. The Title Agents, acting on Commonwealth's behalf and subject to Commonwealth's direction and control, are responsible for conducting the title searches and (with Commonwealth's assistance) calculating the title insurance premiums. The Title Agents take a percent of the premiums collected as their remuneration for their services.

(Pl. Am. RICO St., 6b.) Defendant contends that because Plaintiffs claim in the Amended Complaint that Commonwealth Land acted only through *its* title agents, the "person" and "enterprise" are one and the same. (Def. Mot. to Dismiss, 23.) According to Defendant, Plaintiffs have failed to allege a valid association-in-fact enterprise because no "person" is distinct from the alleged "enterprise."

Consideration of the parties' distinctiveness argument requires a review of <u>Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.</u>, the Third Circuit's opinion outlining this Circuit's interpretation of the RICO distinctiveness mandate. 46 F.3d 258 (3d Cir. 1995). In <u>Jaguar Cars</u>, the court confronted the issue of whether plaintiff alleged illicit activity by a "person" or defendant who participated in a separate and distinct "enterprise." <u>Id.</u> at 262. In that case, plaintiff Jaguar Cars claimed that individual owners of a jointly-owned Jaguar dealership, named Royal Oaks Motor Car Company, perpetuated a scheme to submit fraudulent warranty claims to plaintiff. <u>Id.</u> at 260. Plaintiff alleged that the individual owners were the "persons" operating and managing the Royal Oaks dealership and named them as defendants in the case. The Royal Oaks dealership was the designated "enterprise" through which the defendants engaged in a pattern of racketeering activity that defrauded plaintiff. The Third Circuit held that naming the Royal Oaks dealership as the "enterprise" and its owners as "persons" or defendants satisfied the distinctiveness requirement of § 1962(c).

<u>Jaguar Cars</u> is factually distinguishable from the present matter because that case alleged conduct by individual corporate officers who managed a corporate enterprise. However, language in <u>Jaguar Cars</u> is relevant here. The court noted that "a corporation would be liable under § 1962(c) only if *it* engages in racketeering activity as a 'person' in another distinct 'enterprise.'" <u>Id.</u> at 268

18

(emphasis in original).  In other words, to survive the Motion to Dismiss, Plaintiffs here must factually allege that Defendant Commonwealth Land *itself* is the "person" who participated in and perpetuated a separate and distinct fraudulent enterprise.

Plaintiffs claim that the enterprise here consists of a combination of Commonwealth Land and the title/settlement agents and that each "member of the Enterprise performs a role in the group consistent with its organizational structure which furthers the activities of the Enterprise to market and sell title insurance." (Pl. Am. Compl. ¶59.)[7]  Plaintiffs allege that Commonwealth Land acted through a network of title agents with whom Defendant contracted.  (Id. at ¶60.)  These title agents are independent and distinct entities and individuals.  In the TIRBOP Manual, "agent" is described as "a person, firm, association, corporation, partnership, cooperative or joint stock company expressly authorized by written contract with an Insurer to solicit risks, collect fees, and prepare Commitments and/or title insurance policies on its behalf and certified by the Insurance Department of the Commonwealth of Pennsylvania."  § 1.3.  The title agents are not employees of Defendant, but rather they are non-exclusive agents who work with different title insurance companies. Although title agents have an agency agreement with Commonwealth Land, they are still separate, independent entities who do not function as subsidiaries or employees of Commonwealth Land.

---

[7] If Plaintiffs' claim was that the enterprise consisted of a defendant corporation in association with its own employees or representatives, Defendant would be correct that the RICO count would fail for lack of distinctiveness.  See R.R. Brittingham, 943 F.2d at 301 (finding that the distinctiveness requirement would be eviscerated if plaintiffs were allowed to plead an enterprise consisting of a corporation and its own employees or agents acting on its behalf).  The enterprise here consisting of the combination of the title insurance company and the independent title agents is factually different from the enterprise described in Brittingham.

Courts have upheld an association-in-fact enterprise in which the RICO defendant or "person" is a corporation and the enterprise consists of the defendant corporation and other members who are under a contractual obligation with the defendant. <u>See</u> <u>e.g.</u>, <u>Hanrahan v. Britt</u>, No. 94-4615, 1995 WL 422840, *7 (E.D. Pa. July 11, 1995) (concluding that Defendant Amway was distinct from the alleged association-in-fact enterprise consisting of Amway and its network of Amway distributors); <u>In re: Countrywide Financial Corp. Mortg. Marketing and Sales Practices Litigation</u>, 601 F. Supp.2d 1201, 1212-13 (S.D. Cal. 2009) (finding that Defendant Countrywide and its organization of mortgage brokers with whom it contracted to sell loans issued by Countrywide constituted a valid association-in-fact enterprise).

In <u>Living Designs, Inc. v. E.I. Dupont de Nemours and Co.</u>, plaintiff alleged a RICO enterprise consisting of manufacturer DuPont, the law firms it employed, and the expert witnesses the law firm retained in defending numerous products liability actions. 431 F.3d 353, 361 (9th Cir. 2005). Plaintiffs alleged that the RICO "person" was defendant DuPont. <u>Id.</u> The Ninth Circuit found that there was "no question" that DuPont and the law firms it employed to represent the company in litigation could constitute an association-in-fact enterprise, and that enterprise was wholly separate and distinct from the "person" DuPont. <u>Id.</u>

Similarly, in <u>Williams v. Mohawk Indus., Inc.</u>, plaintiffs alleged an association-in-fact enterprise between Defendant Mohawk and third-party agents used to harbor undocumented workers and to destroy documentation. 465 F.3d 1277, 1284 (11th Cir. 2006). The Eleventh Circuit found that Mohawk and its agents formed a valid enterprise distinct from the person, Mohawk corporation. <u>Id.</u>

The case before the Court "is not a situation where the enterprise cannot be either formally or practically separable from the person." Living Designs, 431 F.3d at 362. The minimum amount of "separateness" between a "person" and "enterprise" required for a RICO violation was described in Cedric Kushner, supra at 163. In that case, the Court confronted the question of whether there are technically two entities (a "person" and an "enterprise") where the person (Don King) is the president, employee and sole shareholder of a closely held corporation (Don King Productions) and the alleged enterprise is the corporation itself. Id. at 160. The Court held that Don King as corporate owner/employee was distinct from the Don King Productions corporation. Id. at 163. In so finding, the Court explained that RICO simply requires a formal legal distinction between the "person" and "enterprise." Id. at 165. See also McCullough v. Suter, 757 F.2d 142, 144 (7th Cir. 1985) (concluding that all that is required to satisfy the distinctiveness requirement is that the enterprise be formally or practically separable from the individual).

Here, Plaintiffs have satisfied the minimum "person" and "enterprise" distinctiveness requirement because the combination of Commonwealth Land and the title agents constitute a single "enterprise" separate and distinct from the "person" of Defendant Commonwealth Land and this combination is permissible under RICO jurisprudence.

b. Plaintiffs Sufficiently Allege an
Organized "Enterprise" Structure.

To plead an "association-in-fact" RICO enterprise, Plaintiffs must show: (i) that there exists an ongoing organization, formal or informal; (ii) that the various associates of the organization function as a continuing unit; and (iii) that the organization has an existence separate and apart from the alleged pattern of racketeering activity. United States v. Turkette, 452 U.S. 576, 583 (1981).

The Supreme Court recently outlined the factors to consider in deciding whether an "association in fact" enterprise structure is properly alleged: "[s]uch a[n] [association-in-fact enterprise] need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods..." Boyle v. United States, 129 S.Ct. 2237, 2245 (2009). However, "[v]ague allegations of a RICO enterprise made up of a string of participants... lacking any distinct existence and structure" will not suffice. VanDenBroeck v. Commonpoint Mort. Co., 210 F.3d 696, 700 (6th Cir. 2000).

In this case, the alleged "association in fact" enterprise consisting of Commonwealth Land and its title agents more than satisfies the Boyle standard because there in fact is a hierarchical structure. While some decisions may be made on an ad hoc basis at a settlement, the contractual relationship between Defendant and the title agents and statutory regulations standardize the methods used at closing. Defendant has allegedly used the "association in fact" enterprise to overcharge for title insurance and to mislead the purchaser into believing that a correct amount was being paid.

Moreover, Plaintiffs satisfy the first two prongs of Turkette because the Amended RICO Case Statement sufficiently outlines the structure of a racketeering enterprise. Plaintiffs allege that the relationship between Defendant and its title agents is governed by an agency agreement and that Defendant is the principal in the enterprise because it provides title insurance policies. The title agents act in furtherance of the fraudulent scheme to overcharge insurance purchasers because the title agents simultaneously act as settlement agents at closing. (Pl. Am. RICO St., 6-7.)

In addition, the Amended Complaint contains adequate details of the alleged organization formed between Commonwealth Land and the title/settlement agents under the agency agreement. Plaintiffs allege that the Enterprise exists to advance the interests of the individual entities that make

up its membership. (Pl. Am. Compl. ¶59.) Plaintiffs claim the entities functioned as a continuing unit with a common purpose of deliberately overstating the amounts due and owing for title insurance. (Id. at ¶61.) Commonwealth Land directed these activities and authorized the title agents to issue insurance policies on its behalf. (Id. at ¶60). Plaintiffs allege that Defendant has an agent selection process and audit review program to inspect the title agents' books and records on an annual basis. (Id.) The inference arising from these assertions is that Defendant has knowledge of the fraudulent overcharging. Consequently, Plaintiffs have alleged sufficient facts at the Motion to Dismiss stage to satisfy the minimum structure standards to establish a RICO association-in-fact enterprise.

### c. Plaintiffs Sufficiently Allege an "Enterprise" Distinct From the Pattern of Racketeering Activity.

Plaintiffs have also alleged in the Amended Complaint sufficient facts to satisfy the third prong of Turkette: that the organization has an existence separate and apart from the alleged pattern of racketeering activity. Turkette, 452 U.S. at 583. See also Dianese, Inc. v. Comm. of Pa., No. 01-2520, 2002 WL 1340316, *11 (E.D. Pa. June 19, 2002) ("It is well settled in RICO law that the alleged racketeering activity complained of by plaintiff must be separate and distinct from the enterprise itself...").

In Brittingham, the Third Circuit explained that the alleged enterprise must be "more than" an association of individuals conducting the normal business functions of a corporation. 943 F.2d at 301. Under this premise, Defendant would be correct that Plaintiffs would be foreclosed from bringing a valid RICO action if Defendant's agents simply conducted the normal affairs of a title insurance corporation. (Def. Mot. to Dismiss, 17.)

23

Plaintiffs here, however, do not claim that Defendant and its agents merely conducted the normal affairs of a business relationship. Rather, Plaintiffs allege that the racketeering pattern includes deliberate overcharging and misappropriating amounts due for the purchase of title insurance in violation of law as set forth in the TIRBOP Manual. (Id.) Plaintiffs further allege that these illegal activities constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 and are part of an ongoing pattern of racketeering activity. Critical to the alleged pattern of racketeering activity is the dual function of the title/settlement agent, who not only has the power to prepare documents on behalf of Commonwealth Land, but is also statutorily obligated to abide by the TIRBOP guidelines. (Pl. Am. Compl. ¶62).[8] The fact that the organization between Defendant and its title agents engages in legitimate functions of performing title searches, selling and providing title insurance, and investigating and paying claims does not overcome the claim of illicit overcharging which is not part of the normal affairs of the business relationship.

Plaintiffs have alleged sufficient facts demonstrating that Commonwealth Land played a distinct role as director of the alleged racketeering activity. Plaintiffs allege that Defendant directs the enterprise by, *inter alia*, providing the systems and procedures for conducting title searches, issuing policies, and providing the title insurance. (Pl. Am. Compl. ¶59.) While these activities may seem legitimate on the surface, they are not ordinary or normal business activities if they are used to advance the alleged fraudulent scheme. Moreover, Defendant's "normal affairs" do not include

---

[8]See Introduction in TIRBOP Manual ("The provisions of this Manual are binding upon all members and subscribers of TIRBOP and their agents and must be used on and after the effective date hereof unless a specific deviation from the Manual has been filed by an individual member or subscriber company with, and approved by, the Pennsylvania Insurance Department.").

deliberate overcharging for title insurance, ignoring TIRBOP rate structures, misrepresenting amounts due, and lulling Plaintiffs into a false sense of security through the preparation of the HUD-1. These facts and inferences arise from Plaintiffs' Amended Complaint and the RICO Case Statement which at this stage must be construed in the light most favorable to Plaintiffs. Plaintiffs have sufficiently alleged that the enterprise consists of business activity surrounding title insurance transactions combined with racketeering activity involving repeated overstating amounts due and misappropriation of excess funds collected. See, e.g., United States v. Console, 13 F.3d 641, 651-52 (3d Cir. 1993) ("[I]t is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses.") (quoting United States v. Riccobene, 709 F.2d 214, 223-24 (3d Cir. 1983)). Accordingly, Plaintiffs have sufficiently alleged with particularity a pattern of racketeering which encompasses fraudulent behavior on the part of Commonwealth Land and its title agents that existed apart from a normal business relationship and is distinct from the enterprise described above. (Pl. Am. RICO St., 6b.)

II.  Plaintiffs Sufficiently Allege Predicate Acts of Mail and Wire Fraud.

Defendant next argues that Plaintiffs have failed to allege predicate acts of mail or wire fraud, which are required to sustain a RICO claim. (Def. Mot. to Dismiss, 28.) The elements necessary to establish a claim for mail or wire fraud are: (1) a scheme to defraud; (2) the use of the mails or wires for the purpose of executing the scheme; and (3) fraudulent intent. United States v. Pharis, 298 F.3d 228, 234 (3d Cir. 2002). Unlike mail fraud, wire fraud has an interstate commerce component that must be satisfied. See 18 U.S.C. § 1343.

a. The Scheme to Defraud.

A scheme to defraud means any deliberate plan of action or course of conduct by which someone intends to deceive or cheat another or by which someone intends to deprive another of something of value. Plaintiffs may satisfy the burden by showing a scheme to defraud involving "some sort of fraudulent misrepresentation or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir. 1991). Deceitful statements, half truths, or the knowing concealment of material facts are all actionable under the mail and wire fraud statutes. United States v. Townley, 665 F.2d 579, 585 (5th Cir. 1982).

> The statements need not be false or fraudulent on their face, and the accused need not misrepresent any fact, since all that is necessary is that the scheme be reasonably calculated to deceive person of ordinary prudence and comprehension, and that the mail service of the United States be used in the execution of the scheme.

Id. Additionally, Plaintiffs must allege that Defendant acted with an intent to defraud, which is to act knowingly and with the intention to deceive or to cheat. United States v. Hoffecker, 530 F.3d 137, 181 (3d Cir. 2008). "An intent to defraud is ordinarily accompanied by a desire or a purpose to bring about some gain or benefit to oneself or some other person or by a desire or a purpose to cause some loss to some person." United States v. Leahy, 445 F.3d 634, 644 (3d Cir. 2006) (quoting the District Court's jury instructions).

Here, the dispute centers around the role and effect of the allegedly fraudulent HUD-1 settlement statements used in these transactions. The questions before the Court include: whether the HUD-1 statement is a misrepresentation or simply an accurate statement of the amount paid; and

if there was a misrepresentation, whether Commonwealth Land was obligated to communicate this error to Plaintiffs.

### i. The HUD-1 Statement Furthers the Scheme to Defraud.

Defendant maintains that the HUD-1 statement is a fair and accurate reflection of the amount Plaintiff paid - in effect, it is a receipt, no more, no less. Defendant further argues that since the HUD-1 itself contains no false statement, it can not be the basis of federal mail or wire fraud because the HUD-1 does not make a representation of the correctness of the charges for the title insurance, citing Arthur v. Ticor Title Ins. Co. of Fla., 569 F.3d 154, 162 n.3 (4th Cir. 2009).[9]

Regardless of how one views the HUD-1, Plaintiffs have alleged facts which raise the inference that the HUD-1 served as a step in the plot to cause pecuniary loss to innocent purchasers of title insurance, and the creation of the HUD-1 was an incidental part of the scheme, even if it merely reflected the amount paid by the purchaser. Plaintiffs allege that the amount charged for title insurance as reflected on the HUD-1 is materially incorrect. The information on the HUD-1 would lull title insurance purchasers into believing that the amount listed represents the correct statutory rate when it does not. Although on its face a HUD-1 shows the amount charged and collected by a title insurance company and in this sense may not be a misrepresentation as argued by Defendant,

---

[9] In Ticor, a recent Fourth Circuit decision, plaintiffs alleged factually similar patterns of deliberate overcharging for title insurance under the Maryland Insurance Code and Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, et seq. ("RESPA"). The Fourth Circuit affirmed the district court's dismissal of plaintiffs' claims under RESPA. Id. at 157. The court, in dismissing the claim for negligent misrepresentation, stated in a footnote that plaintiffs did "not validly assert that Ticor made any false statements" on the HUD-1 because the statement simply reflected the amount charged and collected by Ticor. Id. at 162 n.3. Ticor is distinguishable from the instant case because it did not involve an allegation of a scheme to defraud under the mail and wire fraud statutes.

this analysis is far from complete or persuasive when there is an allegation of fraud as advanced here.[10] Plaintiffs claim that the amount shown on the HUD-1 is an overcharge and part of the scheme is to misrepresent to Plaintiffs the correct amount of the premium for title insurance that should have been charged. In this sense, it is a misrepresentation that the correct premium was charged. Given the requirement under RESPA that a uniform settlement statement be used at settlement, 12 U.S.C. § 2603, the HUD-1 has the imprimatur that the figures reflected on it are true and correct. A purchaser of title insurance, or Plaintiffs in this case, would reasonably assume that the charges listed on the HUD-1 were the charges legally due and owing and not an inflated amount.[11]  See Markocki v. Old Republic Nat'l Title Ins. Co., 254 F.R.D. 242, 251 (E.D. Pa. Dec. 9, 2008) (Markocki II) (agreeing with Plaintiff that consumers reasonably relied on the title insurer to abide by TIRBOP and Pennsylvania law).

In this case, viewing the facts at this stage in the light most favorable to Plaintiffs, the dollar amount on the HUD-1 representing the premium for the title insurance was not true and correct and was a misrepresentation which played a role in furthering the overall scheme to defraud. Title

---

[10] Routine and innocent documents can be used as part of a scheme to defraud. See United States v. Schmuck, 489 U.S. 705, 710 (1989) (finding that routine mailings may satisfy the mailing element of the mail fraud offenses); Kehr Packages, 926 F.2d at 1416 n.3 (finding that mail fraud can be predicated on mailings which are "designed to lull the victims into a false sense of security") (internal citations omitted); United States v. Brocksmith, 991 F.2d 1363, 1367-68 (7th Cir. 1993) (finding a "step in the plot" of the scheme to defraud included mail that contained no false or misleading information). Although mail, other than the HUD-1, in furtherance of the scheme to defraud may be relied on by Plaintiffs here, these cases are still persuasive authority that the use of routine and innocent-looking documents may also advance an illicit scheme.

[11] Section 2.9 of the TIRBOP Manual provides notice to a purchaser of title insurance at or prior to closing that if the conveyance or refinance occurs within ten years of a previous issuance of the same property, you may be entitled to a reduced rate. This provision would cause a purchaser who comes within its terms to believe that the rate charged at closing for title insurance was a discounted rate.

insurance rates are set pursuant to a statutory scheme under Pennsylvania law. Once set, the rates have the force of law. When the law is not followed, mischief or even participation in a scheme to defraud may be close behind. The issuance of the HUD-1 is merely a step in the scheme to defraud, the full parameters of which Plaintiffs should be permitted to pursue in discovery because they have advanced sufficient facts in the Amended Complaint to satisfy the <u>Iqbal</u> standard at the Motion to Dismiss stage.

ii. <u>Defendant Owed Plaintiffs a Duty to Disclose.</u>

Defendant argues that Commonwealth Land had no fiduciary duty to disclose the alleged entitlement to the discounted rate or to inform Plaintiffs of the non-disclosure because Defendant had no duty to speak, <u>citing</u> <u>Contawe v. Crescent Heights of Am. Inc.</u>, No. 04-2304, 2004 WL 2244538, *5 (E.D. Pa. Oct. 1, 2004) ("Pennsylvania does not, absent special or unusual facts, recognize a fiduciary relationship between a title insurance agent and a purchaser of real estate.").[12] Defendant also asserts that Plaintiffs are presumed to know the true applicable rates because the TIRBOP manual is a public document available to anyone for inspection.

The duty to disclose arises from the August 2005 Amendment to the TIRBOP Manual because it places the burden on the title insurer or its agent to conduct a title search on the property,

---

[12]Plaintiffs allege that a fiduciary relationship exists between the insured and the title agent due to the dual roles of the title agent at settlement. A fiduciary relationship arises under Pennsylvania law where "'one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other.'" <u>Becker v. Chicago Title Ins. Co.</u>, No. 03-2292, 2004 WL 228672, *8 (E.D. Pa. Feb. 4, 2004) (internal quotations omitted). Regardless of whether or not a fiduciary relationship existed with the title agent or title company, the absence of a fiduciary relationship does not create a license to participate in a scheme to defraud a party who is downstream in the chain of a business transaction.

which included an investigation of the existence of prior title insurance, and to issue the insurance rate based on the findings. Placing this burden on the title insurance company without a duty to disclose and charge the correct amount would render the Amendment meaningless. See Slapikas v. First American Title Ins. Co., No. 06-084, 2009 WL 2869944, **7-10 (W.D. Pa. Sept. 4, 2009) (summarizing the 2005 Amendments to TIRBOP). Defendant has cited no case which stands for the proposition that after the August 2005 Amendment to the TIRBOP Manual the purchasers of title insurance are presumed to know the correct rates which they are charged. In light of the complexity of title insurance rates and the expertise of Defendant and title agents and the burden placed on Defendant under the August 2005 Amendment to the TIRBOP Manual, the argument that Defendant had no duty to disclose the right to the discounted rate is not persuasive. Defendant had the responsibility to charge the correct rate, and disclosure of the correct rate is part and parcel of that responsibility.

### b. Use of Mail or Wires.

To establish a claim for mail or wire fraud, Plaintiffs must show "the use of the mails or wires for the purpose of executing the scheme [to defraud]." Pharis, 298 F.3d at 234. "To be part of the execution of the fraud ... the use of the mails need not be an essential element of the scheme." Schmuck, 489 U.S. at 710. Mailings merely need be "incident to the essential part of the scheme" to satisfy the requirements of the mail fraud offense. Pereira v. United States, 347 U.S. 1, 8 (1954). As noted above, wire fraud has an additional interstate commerce component.

Plaintiffs claim that Defendant engaged in a pattern of racketeering activity consisting of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. (Pl. Am. Compl. ¶¶52-53.) Defendant

purportedly effectuated a fraudulent overbilling and misappropriation scheme by misrepresenting the amount due and owing for title insurance through the use of mail and interstate wires.  (Id.) Specifically, Plaintiffs allege that wires and mail were used to transmit funds in connection with the transactions and mail was used to send checks in connection with the scheme to overcharge for premiums.  Further, Plaintiffs claim that Defendant used mail and wires to induce Plaintiffs to pay the overcharges and to conceal the deliberate overcharging.  (Id. at ¶67.)  Plaintiffs allege that more than two such predicate acts have occurred in the past ten years, as required by § 1961(5).  (Id.) Consequently, Plaintiffs have sufficiently alleged at this stage that Defendant used the mail or wires to effectuate the scheme to defraud.

### c. Fraudulent Intent.

An intent to defraud requires that a party act knowingly and with the intention to deceive or to cheat.  See Hoffecker, 530 F.3d at 181.  Plaintiffs have asserted here that as part of the agency contract between Defendant and its title agents, Defendant reviewed the closings, settlements, related documents, and monies received and collected on Defendant's behalf by the title/settlement agents. (Id. at ¶106.)  Because the title agent and settlement agent were one and the same, the alleged fraud is apparent from the fact that Plaintiffs were overbilled at settlement and lulled into a false sense of security by the settlement agent that the correct amount was charged for title insurance.  Defendant contracted with the title agent and would know the correct rate to be charged because it is obligated to abide by the TIRBOP guidelines.  The inference from these facts is that Defendant permitted the overcharging to occur knowing that Plaintiffs were being intentionally defrauded.  This inference is sufficient to establish an intent to defraud at the Motion to Dismiss stage.

III.  Plaintiffs' Claim is Not Pre-empted by the McCarran-Ferguson Act.

Defendant asserts that even if Plaintiffs state a viable RICO claim, the claim is pre-empted by the McCarran-Ferguson Act.  15 U.S.C. § 1012 (2009).  The Act provides that "no Act of Congress shall be construed to invalidate, impair, or supercede any law enacted by any State for the purpose of regulating the business of insurance." § 1012(b).  This preclusion is applied when, *inter alia*, "application of the federal statute would invalidate, impair, or supersede [relevant state laws]." Sabo v. Metro. Life Ins. Co., 137 F.3d 185, 190-91 (3d Cir. 1998).  As noted, supra, Defendant argued that applying federal law in this case would directly interfere with TICA § 910-44(b), a state insurance law which purportedly provides an exclusive administrative remedy when a party is overcharged for title insurance.  (Def. Mot. to Dismiss, 23.)

As discussed above in Section IV, A, in light of the Pennsylvania Superior Court's White decision, the current TICA landscape is clear: § 910-44(b) does not create an exclusive administrative remedy which would preclude Plaintiffs from filing this private right of action in court.  Accordingly, Plaintiffs' Amended Complaint presents no conflict with state law that is pre-empted by the McCarran-Ferguson Act.

C.  Plaintiffs Assert a Viable Claim under UTPCPL.

Plaintiffs assert a claim under the UTPCPL, 73 Pa. Cons. Stat. § 201-1, *et seq.* (2008), for fraudulent or deceptive conduct in connection with the title insurance transaction.  (Pl. Am. Compl. ¶¶77-78.) The general purpose of this consumer protection law is to protect the public from fraud and unfair or deceptive business practices.  Neal v. Bavarian Motors, Inc., 882 A.2d 1022, 1029 (Pa. Super. 2005).  The UTPCPL "is to be construed liberally to effect its object of preventing unfair or

deceptive practices." <u>Pekular</u>, 513 A.2d at 432 (quoting <u>Commonwealth v. Monumental Properties,</u> <u>Inc.</u>, 329 A.2d 812, 817 (Pa. 1974)).

The UTPCPL provides a private right of action only to purchasers of goods "primarily for personal, family, or household purposes." § 201-9.2. Whether a purchase is primarily for household purposes and a cause of action under the UTPCPL is available depends on the purpose of the purchase, not the type of product purchased. <u>Novinger Group, Inc. v. Hartford Ins., Inc.</u>, 514 F. Supp.2d 662, 670 (M.D. Pa. 2007).

The Court is persuaded that Plaintiffs' claim comes within the UTPCPL's "household purposes" requirement. § 201-9.2. Defendant argues that the title insurance policy Plaintiffs purchased insures NovaStar's interests, as the lender, not those of Plaintiffs. However, Plaintiffs paid for the title insurance in order to refinance a residence they use for household purposes. Lenders require that Plaintiffs pay for the title insurance issued by Defendant as part of the mortgage transaction. (Pl. Am. Compl. ¶24.) Plaintiffs have satisfied UTPCPL's threshold mandate because a mortgage for a home is inherently for a household purpose. <u>See also</u> <u>S. Kane & Son Profit Sharing</u> <u>Trust v. Marine Midland Bank</u>, No. 95-7058, 1996 WL 200603, *3 (E.D. Pa. Apr. 25, 1996) (finding that a purchase of securities satisfied the "household purposes" component because the UTPCPL should be interpreted very broadly to effectuate the legislature's intent).

To bring a claim of fraud under the UTPCPL, Pennsylvania state court precedent requires Plaintiffs to meet the elements of common law fraud. <u>Weinberg v. Sun Co.</u>, 777 A.2d 442, 445-46 (Pa. 2001); <u>see</u> <u>also</u> <u>Rubenstein v. Dovenmuehle Mortgage, Inc.</u>, No. 09-721, 2009 WL 3467769, *5 (E.D. Pa. Oct. 29, 2009) (dismissing UTPCPL claim for failure to allege specific deceptive acts).

Under Pennsylvania law, common law fraud requires: (1) a misrepresentation, (2) material to the transaction, (3) made falsely, (4) with the intent of misleading another to rely on it, (5) justifiable reliance resulted, and (6) injury was proximately caused by the reliance. Santana Products, Inc. v. Bobrick Washroom Equip, Inc., 401 F.3d 123, 136 (3d Cir. 2005).

Here, Plaintiffs have alleged material deceptive acts on Defendant's part that, at this stage, satisfy the elements of common law fraud. Plaintiffs claim, *inter alia*, that Defendant fraudulently misrepresented amounts due and owing for title insurance on the HUD-1, fraudulently misrepresented the results of title searches, and misrepresented and misappropriated the sums charged. (Pl. Am. Compl. ¶77). Plaintiffs allege sufficient facts that Defendant employed unfair practices that caused the likelihood of confusion or misunderstanding in violation of UTPCPL § 201-2(4)(ii). (Id. at ¶78(a)). Moreover, Plaintiffs have also alleged facts showing fraudulent intent.

Under the UTPCPL, a Plaintiff must prove justifiable reliance. See Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004) ("To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance."). Plaintiffs allege sufficient facts of justifiable reliance at this stage by pleading that no Plaintiff "would have knowingly paid a premium for title insurance that was higher than the premium that was actually due and owing." (Pl. Am. Compl. ¶82.) Plaintiffs have alleged reasonable reliance on the veracity of the HUD-1 Statement and on the misrepresentation that the HUD-1 reflected the proper rates to which Plaintiffs were lawfully entitled. (Id. at ¶80.) Indeed, "justifiable reliance is typically a question of fact for the fact-finder to decide, and requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction." Toy v. Metro. Life Ins. Co., 928 A.2d 186, 208 (Pa.

Super. Ct. 2007). Accordingly, Plaintiffs have alleged sufficient facts establishing justifiable reliance on Defendant's alleged misrepresentations regarding the amounts due and owing for title insurance and the harm suffered by that reliance. Moreover, Plaintiffs' pleadings satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b) for fraud because Plaintiffs aver specific details regarding the alleged fraud and the surrounding scheme.[13] (Pl. Am. Compl. ¶53.)

### D. Plaintiffs' Remaining Claims May Proceed.

#### I. Fraudulent Misrepresentation.

Defendant also moves to dismiss Count III, which alleges a common law claim of fraudulent misrepresentation. Defendant claims that the HUD-1 contains no fraudulent misrepresentation. As discussed above with respect to the allegedly fraudulent HUD-1 Settlement Statement, the HUD-1 contains deceptive information, and therefore it is appropriate at this stage for a common law claim of fraudulent misrepresentation to proceed.

#### II. Negligence.

In Count IV, Plaintiffs plead in the alternative that Defendant knew or should have known that Plaintiffs were entitled to receive special discounted rates based on the results of title searches conducted in connection with the transactions. (Pl. Am. Compl. ¶95.) Plaintiffs allege that Defendant, through the title/settlement agents with whom it contracted, had a duty of care to set forth accurate and lawful amounts due and owing for title insurance. (Id. at ¶100.) As part of the agency contract between Defendant and agents, Defendant reviewed the closings, settlements, related

---

[13]Plaintiffs have also provided the specific TIRBOP rate which they claim they should have been charged. (Pl. Am. Compl. ¶¶(53(a)-53(b).) See Lum, 361 F.3d at 226 (the correct "prime rate" must be plead to adequately allege fraud with particularity).

documents, and monies received and collected on Defendant's behalf by title/settlement agents. (Id. at ¶105.) Consequently, Plaintiffs claim Defendant negligently entrusted the agents and negligently failed to supervise the agents' conduct which resulted in this pervasive pattern of overbilling.

Defendant maintains that Plaintiffs have failed to establish that Commonwealth Land owed the insurance purchasers a legal duty. (Def. Mot. to Dismiss, 44.) As discussed above, the duty of care arises from the August 2005 Amendment to the TIRBOP Manual because it places the burden on the title insurer or its agent to conduct a title search on the property, which included an investigation of the existence of prior title insurance, and to issue the insurance rate based on the findings.

Defendant also argues that Plaintiffs are barred from bringing its negligence claim because the present action stems from a contract, not from a duty of care required for a tort claim. The gist of the action doctrine "precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims." eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002). In other words, Plaintiffs only may bring a claim under tort law if the "gist of the action" is based on tortious, rather than contractual allegations. Carcaise v. Cemex, Inc., 200 Fed.Appx. 116, 126 (3d Cir. 2006).

Courts have held that the gist of the action doctrine bars tort claims: "(1) 'arising solely from a contract between the parties'; (2) where 'the duties allegedly breached were created and grounded in the contract itself'; (3) where 'the liability stems from a contract'; or (4) where the tort claim 'essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.'" eToll, 811 A.2d at 19 (internal citations omitted).

Here, Plaintiffs have not plead any contract claims because Plaintiffs did not have a contract with Defendant. Rather, Plaintiffs submit that TICA imposes on Defendant and its agents a duty to charge the rate prescribed in the TIRBOP Manual. <u>See</u> <u>Markocki I</u>, 527 F. Supp.2d at 420-21 (denying a gist of the action defense). Because Plaintiffs have properly averred that the overcharging arose from this duty and the failure of Defendant to adequately supervise its title agents, and in the absence of a contract between Plaintiffs and Defendant, there is sufficient evidence at this stage to find tortious conduct. Accordingly, the Court will deny Defendant's Motion to Dismiss Count IV under Rule 12(b)(6) at this time.

### III. <u>Unjust Enrichment.</u>

Lastly, Plaintiffs' claim of unjust enrichment will survive Defendant's Motion to Dismiss. At this stage, the Court will permit Plaintiffs to plead unjust enrichment in the alternative. <u>See</u> <u>Sudofsky v. JDC, Inc.</u>, No. 03-1491, 2003 WL 22358448, *4 (E.D. Pa. Sept. 3, 2003) ("Plaintiff's claims are alternative theories of recovery based on the same factual circumstances. It would serve no purpose at this early point in the litigation to limit Plaintiff's avenues of recovery when the underlying facts and events for all claims are the same.").

### V. **CONCLUSION**

For the foregoing reasons, the Court will deny Defendant Commonwealth Land's Motion to Dismiss in its entirety. An appropriate Order follows.