

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA



STEPHANIE COLEMAN AND JANELLE
BOWMER, on behalf of themselves and all
others similarly situated,

          Plaintiffs,

    v.

COMMONWEALTH LAND TITLE
INSURANCE COMPANY,

          Defendant.

CIVIL ACTION
NO. 09-679 F.le



MITCHELL AND RANDI SCHWARTZ, and
EDWARD AND MARY BURNSIDE, on
behalf of themselves and all others similarly
situated,

          Plaintiffs,

    v.

LAWYERS TITLE INSURANCE
COMPANY,

          Defendant.

CIVIL ACTION
NO. 09-841 ✗

## OPINION

**Slomsky, J.**                                                      **August 16, 2016**

### TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................................... 1

II.    BACKGROUND ................................................................................................................ 1

    A.    Factual Background ................................................................................................... 1

    B.    Identifying Class Members ........................................................................................ 4

mailed to: A. Miller

T. Collins    E. Fox
S. Save      E Rodgers
R Haimes   J Harris
G. Kahn     D. McKenna

i



|     | C.  | Procedural Background............................................................................................ 6 |
| III. |     | STANDARD OF REVIEW ............................................................................................ 7 |
| IV. |     | ANALYSIS.................................................................................................................... 9 |
|     | A.  | Commonality and Predominance Requirements Are Not Satisfied......................... 10 |
|     | 1.  | Alleged UTPCPL Violations ................................................................................. 11 |
|     | 2.  | Alleged RICO Violations...................................................................................... 16 |
|     | B.  | Ascertainability Is Not Satisfied ........................................................................... 26 |
| V.  |     | CONCLUSION............................................................................................................ 29 |

# I. INTRODUCTION

This case involves several Plaintiffs who allege that when they purchased homeowner's title insurance from Defendants, they did not receive discounts to which they were entitled under Pennsylvania law, which resulted in an overcharge. Plaintiffs seek to represent and to have certified a class of individuals who, like Plaintiffs, have been overcharged on their purchase of title insurance from Defendants.

Before the Court is Plaintiffs' Corrected Motion for Class Certification.[1] (Doc. No. 116.) Defendants have filed a Response in Opposition. (Doc. No. 120.) On December 8, 2015, the Court held a hearing on the Motion at which counsel for the parties presented arguments on their respective positions. Also before the Court is Defendants' Motion to Strike, which seeks to strike from the Court's consideration certain parts of Plaintiffs' post-hearing supplemental briefing. (Doc. No. 147.)

After reviewing the numerous filings of the parties, as well as considering the arguments made at the class certification hearing, the Court will grant Defendants' Motion to Strike and deny Plaintiffs' Motion for Class Certification.

# II. BACKGROUND

## A. Factual Background

Defendants Commonwealth Land Title Insurance Company ("Commonwealth Insurance") and Lawyers Title Insurance Company ("Lawyers Insurance") sell title insurance to homeowners. (Doc. No. 116-1 at 8.) Title insurance protects against loss or damage suffered by homeowners that result from any encumbrances or other defects in the marketability of their real

---

[1] The docket numbers throughout this Opinion refer to Coleman et al. v. Commonwealth Land Title Insurance, Civ. A. No. 09-679 (E.D. Pa. filed Feb. 18, 2009), although the decision of the Court will apply to both cases.

property. 40 Pa.C.S. § 910-1(1). Under Pennsylvania law, 40 Pa.C.S. § 910, providers of title insurance, such as Defendants, are required to offer title insurance to homeowners at rates set forth in the Manual of Title Insurance Rating Bureau of Pennsylvania (the "Rate Manual"). (Doc. No. 116-1 at 8.) When a homeowner secures a mortgage on a home or decides to refinance it, the Rate Manual establishes specific rates that title insurance providers must charge homeowners applying for title insurance policies. (Id.)

Under the Rate Manual, a homeowner applying for title insurance is entitled to a discounted rate when there is evidence of previous insurance on the property. (Doc. No. 120 at 19.) Evidence of previous insurance would include "a deed to a bona fide purchaser for value, or an unsatisfied mortgage to an institutional lender" within a specified time period, or "a copy of the prior policy, a copy of the marked-up commitment, a settlement sheet showing payment of a title insurance premium, or other written evidence acceptable to the Insurer that title insurance coverage was purchased for the property." (Doc. No. 120, Ex. 1 at § 2.8.) A homeowner qualifies for these reduced "reissue" or "refinance" rates when the "real property to be insured is identical to, or a part of, the real property previously insured." (Doc. No. 120 at 19 (citing Ex. 1 at §§ 5.3, 5.6).) Plaintiffs assert that they, and the class they seek to represent, qualified for these discounts.

When a homeowner seeks to finance or refinance a house, title insurance from a title insurance provider typically is acquired through an independent agent. (Id. at 21.) Independent title agents are regulated by Pennsylvania law, and they serve as intermediaries between the prospective policy holder and the title insurance provider. (Id. at 22.) They are required to sell title insurance on behalf of the insurance provider at rates that adhere to the mandates of the Rate Manual. (Id.) The agent will calculate the insurance premiums and prepare the necessary

2

documents for the homeowner. (Id. at 23-24.) Specifically, the agent will "search the chain of title for prior deeds and mortgages, prepare title insurance commitments that identify and except prior mortgages unless satisfied, prepare HUD-1 Settlement Statements, . . . [and] execute the HUD-1 [at closing]."[2] (Doc. No. 116-1 at 17.)

Plaintiffs are Pennsylvania homeowners who applied for title insurance from Defendants. Plaintiffs claim that Defendants have not complied with the regulations established in the Rate Manual and have overcharged them in providing title insurance policies. (Id. at 8.) Plaintiffs allege that in 2005 and 2006, Defendants overcharged Plaintiffs between $92 and $318 by not applying discounts to their insurance policies to which they were entitled according to the Rate Manual. (Id. at 8-9.) They assert that Defendants engaged in fraudulent and deceptive practices by misappropriating funds through overcharging customers of insurance policies that were entitled to discounts, in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Cons. Stat. § 201, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. (Id. at 32, 35.) Plaintiffs seek to represent a class of similarly situated individuals who have been unlawfully overcharged for their insurance policies and allegedly defrauded by Defendants from 2005 to 2012.[3]

---

[2] A HUD-1 Settlement Statement is a standardized federal form that itemizes services and fees that a mortgagee charges a mortgagor when aplpying for a loan to purchase or refinance real estate.

[3] The "Class Period" consists of class members who were overcharged by Commonwealth Insurance during the period of August 1, 2005 through June 30, 2012, and those who were overcharged by Lawyers Insurance during the period of August 1, 2005 through June 30, 2010. (Doc. No. 116-1 at 14.) Plaintiffs seek to certify a class of Pennsylvania homeowners who were overcharged by Defendants in violation of RICO, as well as a subclass of individuals who were overcharged by Defendants in their purchase of homes that "were to be used for personal, family, or household purposes," in violation of the UTPCPL. (Id. at 14-15.)

## B. Identifying Class Members

Plaintiffs assert that they can identify members of the class they seek to represent through a computer model and system that their expert, Michael Pakter, has generated (the "Pakter Model").[4] (Doc. No. 116-1 at 11.) The Pakter Model begins by examining two computer

---

[4] The Pakter Model as described in this Opinion relates to the versions provided to the Court in the pre-hearing briefings, about which Mr. Pakter testified at the hearing. (See Doc. No. 118, Ex. 1; Doc. No. 127, Ex. 1; Doc. No. 141.) In their post-hearing supplemental briefing, Plaintiffs attempt to rely upon an attached updated version of Mr. Pakter's expert report. (Doc. No. 143.) Defendants have moved to strike this post hoc expert report from the Court's consideration as untimely. (Doc. No. 147.) That Motion will be granted (except as to the demand for expenses and costs), and the Court will cite to Plaintiffs' expert reports, and briefings thereon, which were timely provided to the Court and about which Mr. Pakter testified at the class certification hearing.

By Stipulation and Court Order, the conclusion of expert discovery in this case was extended to October 30, 2015. (Doc. No. 122 at 3); see also Fed. R. Civ. P. 26(a). Plaintiffs' expert, Mr. Pakter, provided several versions of his report, about which he testified at the December 8, 2015 hearing on class certification. The Court permitted both parties to provide supplemental briefing. (Doc. No. 141 at 175.) Although the Court asked Plaintiffs to provide more clarity in the supplemental briefing as to how class members would be identified, this request was not an invitation to contravene the Court's deadline on expert discovery by using a new methodology contained in a supplemental expert report. Plaintiffs did not seek leave to submit a supplemental expert report. See Apotex v. Cephalon, Inc., No. 06-cv-2768, 2014 WL 4933009 (E.D. Pa. Oct. 1, 2014) (holding that such a request must be made so that all parties have the opportunity to provide their positions on the propriety of such a supplement, and so that the court has the opportunity to consider those arguments); see also ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 298 (3d Cir. 2012) (outlining factors a court will consider when a party requests leave to provide a new expert report). Accordingly, the Court will consider the reports, and the methodologies contained therein, that were timely filed, fully briefed, and the subject of testimony at the hearing.

Even if the Court were to consider the amendments made to the Pakter Model in the supplemental expert report, the outcome of the Court's decision to deny class certification would not change. First, Plaintiffs argue that this report should be considered because it merely bolsters Plaintiffs' satisfaction of Rule 23(a)'s numerosity requirement. (Doc. No. 149 at 5.) As Plaintiffs note, the satisfaction of this requirement has not been contested. (Id.) Therefore, consideration of this supplemental report is superfluous. Second, Plaintiffs assert that the new model is relevant because it affects the Court's analysis of the ascertainability of the class. (Id.) As discussed below, the proposed class fails to meet the ascertainability requirement, and potential enlargement of the class as proposed by the amended methodology in the supplemental expert report does not cure these deficiencies. Third, the proposed class fails to meet other requirements of Rule 23. For this reason, Plaintiffs' Motion for Class

databases maintained by Defendants: TRAX and TitleWave. (Doc. No. 120 at 32.) TRAX is an accounting system that stores data relating to transactions between a homeowner seeking title insurance and the agent selling the policy on behalf of Defendants. (Id. at 33.) The agent submits the data to the system, which includes the policy number, policy date, rate type, liability amount, policy premium, and property type. (Id.) TitleWave is a software service offered by Defendants to agents for a fee, but agents are not required to use it. (Id.) If an agent uses the program, he or she will place a title search order into the TitleWave system, which will then generate a chain of title for a particular property for the agent's review. (Id. at 22.) These two databases are matched against each other to create the "Matched Set," which narrows the group of insureds who potentially have been overcharged by Defendants in contravention of the Rate Manual. (Doc. No. 127 at 8-9.)

Next, Mr. Pakter will manually examine the individual HUD-1's of the transactions that appear in the Matched Set to document the premium charged to the homeowner, the settlement date, the address of the property, and any previous financing of the property. (Id. at 9; Hr'g Tr., 18:8-11, Dec. 8, 2015; see also Hr'g Tr., 19:8-10, Dec. 8, 2015 ("I could not offer an opinion as to an overcharge until I had examined the physical HUD-1 form.").) The majority of these HUD-1's are kept in the files of over 1,100 independent agents who executed the insurance policies on behalf of Defendants, many of which are stored off-site in a separate facility. (Doc. No. 120 at 36-37.) Thus, obtaining these HUD-1's, which are critical for identifying class members, requires serving subpoenas on each agent and responding to any objections to those subpoenas that might be raised. (Id. at 36; Doc. No. 143 at 6.) To date, Mr. Pakter has examined the HUD-1 forms obtained from only three title agents that sell insurance in Pennsylvania—

---

Certification would be denied regardless of whether it met the Third Circuit's ascertainability requirement.

5

Trident Land Transfer Company LP, First Platinum Abstract, LLC, and PenFed Title, LLC. (Doc. No. 127, Ex. 1 at 6.)

Mr. Pakter also "applies formulas he . . . derived to compute the premium payable with respect to the current financing, including any discounts, in accord with the Rate Manual" to determine if a homeowner has been overcharged. (Doc. No. 127 at 9.) After determining that his original model was deficient, Mr. Pakter made certain "refinements" to his formulas and his method of examining the HUD-1's.[5] (Hr'g Tr., 19-20, Dec. 8, 2015.) Mr. Pakter testified that his model generates an overcharge rate of 12% of transactions that would then be subject to HUD-1 verification. (Id. at 46:5-8.) He concluded that out of the 824 HUD-1s he had examined, there were 186 instances of overcharges that were not in accord with the Rate Manual, in addition to Plaintiffs' overcharges.[6] (Id. at 19-20.)

### C. Procedural Background

On February 18 and 26, 2009, Plaintiffs filed Complaints against Defendants. (Civ. A. No. 09-679, Doc. No. 1; Civ. A. No. 09-841, Doc. No. 1.) On January 20, 2015, after years of litigation and discovery, Plaintiffs filed a Corrected Motion for Class Certification. (Doc. No. 116.) Defendants filed a Response in Opposition (Doc. No. 120), Plaintiffs filed a Reply (Doc. No. 127), and Defendants filed a Surreply in Opposition to Class Certification (Doc. No. 132). Plaintiffs also filed a Sur-Surreply in Support of Class Certification. (Doc. No. 134.)

---

[5] Mr. Pakter testified that the "primary change in the second report was to use the HUD-1 settlement date as the date for [his] calculations, and not the policy effective date recorded in [D]efendants' database." (Hr'g Tr., 22:23-23:1, Dec. 8, 2015.) These refinements resulted in Mr. Pakter adding newly found overcharges, as well as removing several listed transactions that he erroneously determined were overcharges. (Id. at 20-23.)

[6] This sample of HUD-1s came from the application of various formulas and criteria to the Matched Set which identified 2,509 possible overcharges. (Hr'g Tr., 43-47, Dec. 8, 2015.) The supplemental export report enlarges the pool of possible overcharges to 4,589 that would be "subject to HUD-1 verification." (Doc. No. 143 at 5.)

As noted, on December 8, 2015, the Court held a hearing on Plaintiff's Motion for Class Certification. (Doc. No. 141.) On March 7, 2016, both parties submitted post-hearing supplemental briefs on their respective positions regarding the Motion for Class Certification. (Doc. Nos. 143, 144.)

For the following reasons, the Court will deny Plaintiffs' Motion for Class Certification.

## III.    STANDARD OF REVIEW

A district court reviews a class certification motion for compliance with the requirements of Federal Rule of Civil Procedure 23(a) and one of the subcategories of Rule 23(b). In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008). Rule 23 states, in relevant part:

> (a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.
>
> (b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:
>
> . . .
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23.

7

In Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013), the United States Supreme Court

reaffirmed the principles that must guide a district court's analysis of a class certification motion:

> The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23. The Rule does not set forth a mere pleading standard. Rather, a party must not only be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a). The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b).

> . . . .

> Repeatedly, we have emphasized that it may be necessary for the [district] court to probe behind the pleadings before coming to rest on the certification question, and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim. That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.

Comcast Corp., 133 S. Ct. at 1432 (internal citations, quotation marks, and emphasis omitted).

Therefore, "every putative class action must satisfy the four requirements of Rule 23(a) and the

requirements of either Rule 23(b)(1), (2), or (3)." Marcus v. BMW of N. Am., LLC, 687 F.3d

583, 590 (3d Cir. 2012). "The party seeking certification bears the burden of establishing each

element of Rule 23 by a preponderance of the evidence." Id. at 591. "In other words, to certify a

class the district court must find that the evidence more likely than not establishes each fact

necessary to meet the requirements of Rule 23." In re Hydrogen Peroxide Antitrust Litig., 552

F.3d at 320.

The Third Circuit also recognizes an additional factor that must be considered when

certifying a class, which it calls "ascertainability." See Carerra v. Bayer Corp., 727 F.3d 300,

8

305 (3d Cir. 2013). Under this factor, "[a] plaintiff must show, by a preponderance of the evidence, that the class is currently and readily ascertainable based on objective criteria." Carerra, 727 F.3d at 306 (citation omitted). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate" when considering if a proposed class is ascertainable. Marcus, 687 F.3d at 593. "In sum, to satisfy ascertainability . . . the plaintiff must demonstrate his purported method for ascertaining class members is reliable and administratively feasible." Carrera, 727 F.3d at 308. The ascertainability requirement serves to "eliminate[] serous administrative burdens that are incongruous with the efficiencies expected in a class action." Marcus, 687 F.3d at 593 (quotation omitted).

Furthermore, a party seeking class certification "must be prepared to prove" that class certification requirements are met "*in fact*." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." Gen. Tel. Co. of Sw. v. Falcon, 547 U.S. 147, 160 (1982). "Frequently that . . . will entail some overlap with the merits of the plaintiff's underlying claim . . . [because] 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" Wal-Mart, 564 U.S. at 351 (quoting Falcon, 457 U.S. at 160). Thus, a district court is permitted to inquire as to the merits of a claim relevant to class certification, even those "touching on elements of the cause of action." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 307.

## IV.    ANALYSIS

As noted above, when a party seeks class certification under Federal Rule of Civil Procedure 23(b)(3)—which Plaintiffs here seek—six requirements must be met. Defendants dispute whether Plaintiffs have satisfied two of Rule 23's requirements—commonality and

9

predominance. (Hr'g Tr., 159:5-9, Dec. 8, 2015.) Additionally, the parties disagree about whether Plaintiffs have satisfied the Third Circuit's ascertainability prerequisite for class certification. (Id. at 5:4-9.) The Court will address these three requirements in turn.

## A. Commonality and Predominance Requirements Are Not Satisfied

Rule 23(a)(2) of the Federal Rules of Civil Procedure requires that a party seeking class certification demonstrate that "there are questions of law or fact that are common to the [proposed] class." "Commonality is satisfied when there are classwide answers." Reyes v. Netdeposit, LLC, 802 F.3d 469, 482 (3d Cir. 2015) (citing Wal-Mart, 564 U.S. at 350). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury . . . [not] merely that they have all suffered a violation of the same provision of law." Wal-Mart, 564 U.S. at 349-50. Commonality is not met when there are dissimilarities between the injuries suffered by class members resulting from alleged violations of law which impede the resolution of a common question "in one stroke." Id. at 350.

Rule 23(b)(3) contains a counterpart to Rule 23(a)(2), requiring that a class certified under it can only be maintained if "questions of law or fact common to class members predominate over any questions affecting only individual members." "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997). "The predominance inquiry seeks to resolve whether there are reliable means of proving classwide injury." Reyes, 802 F.3d at 498 (quotations omitted).

"It is often appropriate to discuss commonality and predominance together because the commonality inquiry is subsumed into the predominance inquiry." Id. at 486. A district court is permitted to analyze the satisfaction of these two requirements together. Id. Therefore, because the arguments made by the parties relate to Plaintiffs' satisfaction of both commonality and

10

predominance requirements, the Court will address them together in reviewing each of Plaintiffs' causes of action.

### 1. Alleged UTPCPL Violations

Plaintiffs first seek class certification for Defendants' alleged violations of the UTPCPL's "catchall provision." See 73 Pa. Cons. Stat. § 201-2(4)(xxi) (prohibiting "fraudulent or deceptive conduct which creates the likelihood of confusion or of misunderstanding" in the sale of goods or services). To prevail on such a claim, Plaintiffs are required to establish: 1) Plaintiffs purchased "goods or services primarily for personal, family, or household purposes"; 2) Defendants engaged in "fraudulent or deceptive conduct" that created "a likelihood of confusion or of misunderstanding"; and 3) Plaintiffs suffered an ascertainable loss of money as a result of Defendants' fraudulent conduct. 73 Pa. Cons. Stat. §§ 201-9.2(a), 201-2.[7] This means that to establish liability, a plaintiff must prove that the defendant made a misrepresentation to the plaintiff, that the plaintiff justifiably relied on that misrepresentation, and that the plaintiff's justifiable reliance caused an ascertainable loss. Markocki v. Old Republic Nat'l Title Ins. Co., Civ. A. No. 06-2422, 2015 WL 3421401, at *4 (E.D. Pa. May 27, 2015); see also Montanez v. HSBC Mortg. Corp., 876 F. Supp. 2d, 504, 519 (E.D. Pa. 2012).

The showing of justifiable reliance is critical to a claim brought under the UTPCPL. The Third Circuit has specifically instructed that "[the Pennsylvania Supreme] Court has categorically and repeatedly stated that, due to the causation requirement in the [UTPCPL] . . . a

---

[7] 73 Pa. Cons. Stat. § 201-9.2(a) provides, in relevant part:

> Any person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of . . . [an] act or practice declared unlawful . . . by this act, may bring a private action to recover actual damages . . .

"Unlawful acts or practices" includes "engaging in any [] fraudulent or deceptive conduct which creates the likelihood of confusion or of misunderstanding." Id. at §§ 201-2(4)(xxi), 201-3.

private plaintiff pursuing a claim under the statute must prove justifiable reliance." Hunt v. U.S. Tobacco Co., 538 F.3d 217, 221 (3d Cir. 2008) (citing Shwartz v. Rockey, 593 A.2d 885, 897 n.16 (Pa. 2007)). The need to show justifiable reliance is a "broad rule" created by the Pennsylvania Supreme Court that applies to all provisions of the statute, including "the 'deception' prong of the [UTPCPL'S] catch-all provision." Id. at 226-27. In proving justifiable reliance, a plaintiff must "show that he justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the misrepresentation." Slemmer v. McGlaughlin Spray Foam Insulation, Inc., Civ. A. No. 12-6542, 2013 WL 3380590, at *6 (E.D. Pa. July 8, 2013).

The justifiable reliance element of a UTPCPL claim makes such a claim inappropriate for class treatment because a plaintiff pursuing such a claim generally will fail to meet the commonality and predominance requirements of Rule 23. This is so because "[d]etermining justifiable reliance requires individual inquiries into each class member's transaction." Markocki, 2015 WL 3421401 at *6. "The need to show each class member's justifiable reliance on [an individual agent's] deceptive conduct overwhelms common issues . . . [and] cannot be resolved 'in one stroke' but raises individual issues that render [a UTPCPL claim] unfit for class treatment." Id. (quoting Wal-Mart, 564 U.S. at 350). In such circumstances, commonality and predominance cannot be satisfied. For this reason, several courts within this District and other districts in Pennsylvania have decertified classes where plaintiffs brought UTPCPL claims against title insurance providers. See, e.g., Markocki, 2015 WL 3421401, at *6 (the need to show justifiable reliance "implicates the commonality and predominance of the certified class" and thus makes it "unfit for class treatment"); Cohen v. Chi. Title Ins. Co., Civ. A. No. 06-873, 2013 WL 842706, at *5 (E.D. Pa. Mar. 7, 2013) ("[Plaintiff] cannot maintain a class action for a

12

violation of the UTPCPL's catch-all provision because the need to show justifiable reliance on [defendant's] deceptive conduct renders such claims unsuitable for class treatment"); Slapikas v. First Am. Title. Ins. Co., 298 F.R.D. 285, 291 (W.D. Pa. Mar. 7, 2014) ("[P]roof of justifiable reliance makes individual issues predominate over issues common to the class").

The Court agrees that each class member would need to show separately that he or she justifiably relied on any misstatements made by the individual title agent, or that he or she relied on misstatements contained in the HUD-1's that led to his or her detriment. This is not a question common to the class that can be resolved by a common answer "in one stroke." The individual determination of justifiable reliance is critical to proving Defendants' liability, thereby predominating over any common issues. Therefore, the necessity of showing justifiable reliance undermines Plaintiffs' ability to meet the commonality and predominance requirements of Rule 23.[8]

Plaintiffs argue that even if showing justifiable reliance is required—which it is— justifiable reliance can be presumed on a classwide basis. (See Doc. No. 116 at 36.) First, Plaintiffs insist that there is a permissible presumption of justifiable reliance given the fiduciary relationship between the consumer and the title agent. (Doc. No. 127 at 27.) Plaintiffs' argument stems from language in Hunt, in which the Third Circuit noted a narrow exception under Pennsylvania law to the rule requiring individualized showings of justifiable reliance in

---

[8] Plaintiffs cite to two Pennsylvania Court of Common Pleas decisions, both authored by the same judge, which held that justifiable reliance need not be shown in a class action asserting a UTPCPL claim. See (Doc. No. 143 at 18-19 (citing Toth v. Nw. Savings Bank, GD-12-008014, 2013 WL 8538695 (Pa. Ct. Com. Pl., Allegheny Mar. 1, 2003); Patterson v. Fid. Nat'l Title Ins. Co., Nos. GD-03021176, GD-05-017476 (Pa. Ct. Com. Pl., Allegheny Dec. 14, 2015)).) However, the Court is more persuaded by the authority of the Third Circuit (Hunt), courts within this District (Cohen; Markocki), other district courts within Pennsylvania (Slapikas), and the Pennsylvania appellate courts (Kern v. Lehigh Valley Hosp., Inc, 108 A.3d 1281, 1290 (Pa. Super. Ct. 2015)), all of which establish that justifiable reliance must be shown— individually—and thus UTPCPL claims will fail to meet class action requirements.

13

the class action context. Hunt, 585 F.3d at 227 n.17. That exception arises when there exists a fiduciary relationship between defendants and class members, and in such cases, justifiable reliance may be presumed. Id. (citing Debbs v. Chrysler Corp., 810 A.2d 137 (Pa. Super. Ct. 2002) ("[P]laintiffs need not show individualized detrimental reliance with respect to [defendant, because defendant's] fiduciary relationship with plaintiffs establish[es] detrimental reliance as a matter of law")). Plaintiffs argue that they have a fiduciary relationship with the title agents, and thus the exception applies and they need not show individualized justifiable reliance.

Plaintiffs are incorrect in claiming that a fiduciary relationship between title agents and consumers exists. Courts in this District have consistently held that under Pennsylvania law, neither an insurer nor its agents have a fiduciary duty to their insureds. See, e.g., Cohen, 2013 WL 842706, at *3 (holding that "Pennsylvania law is clear that the relationship between the insurance agent and the purchaser reflects the quintessential [relationship] of seller and buyer, [] rather than a confidential relationship" (quotations omitted)); Allen-Wright v. Allstate Ins. Co., Civ. A. No. 07-4087, 2008 WL 5336701, at *6 (E.D. Pa. Dec. 17, 2008) ("[U]nder Pennsylvania law, insurers generally do not owe a fiduciary duty to their insureds" (quotations omitted)); Contawe v. Crescent Heights of Am., Civ. A. No. 04-2304, 2004 WL 2244538, at *5 (E.D. Pa. Oct. 1, 2004) ("Pennsylvania does not, absent special or unusual facts, recognize a fiduciary relationship between a title insurance agent and a purchaser of real estate"). These principles apply to title insurance transactions. See Cohen, 2013 WL 842706, at *3; Contawe, 2004 WL 2244538, at *5. Thus, Plaintiffs' argument that a fiduciary relationship exists is unavailing, and Plaintiffs accordingly are not entitled to a presumption of justifiable reliance.[9]

---

[9] To counter the prevailing view that no fiduciary relationship exists between insurers and insureds in this context, Plaintiffs cling to the expert testimony of Mark Korman, a defense expert, who testified during a September 2, 2015 deposition that such a relationship existed.

Second, Plaintiffs assert that "each Class member's payment of such fees [for title insurance] in exchange for a loan commitment is circumstantial proof of reliance on the lenders' misrepresentations and omissions." (Doc. No. 116 at 36.) According to Plaintiffs, these misrepresentations in the form of material omissions entitle Plaintiffs to a reasonable inference of reliance. (Doc. No. 127 at 31.) As an initial matter, the fact that Plaintiffs paid a fee for title insurance is not "circumstantial proof" of reliance. Courts in this District have held as much. See Markocki, 2015 WL 3421401, at *6 (holding that "the fact of payment for title insurance does little to answer whether a class member relied [on the alleged misrepresentation] . . . [or] whether that reliance, if any, was justifiable"); Davis v. Bank of Am., N.A., 2016 WL 427049, at *6 (same, in the foreclosure context). Next, Plaintiffs' material omission argument is still subject to a justifiable reliance inquiry, not a presumption of reliance, when considering class certification. See Hunt, 538 F.3d at 226 (holding that material omissions are subject to an individualized justifiable reliance inquiry, not a presumption of reliance); Cohen, 2013 WL 842706, at *3 ("Whether a plaintiff's reliance on defendant's deceptive conduct was justifiable . . . requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction" (quotations omitted)). Here, determining whether each agent made material omissions, whether each class member actually read the entirety of the HUD-1 that he or she signed, whether each class member understood the document that he or she was signing—as Plaintiffs admit, "[t]hey are faced with a bewildering document – the HUD-1"—and if not, whether the class member would have signed the document but for the agent's material omission, requires individual inquiries of each class member. For example, Plaintiffs Coleman

<hr/>

(Doc. No. 127 at 29; Doc. No. 132, Ex. 52.) However, Mr. Korman said that he was not a lawyer and did not know the legal definition or significance of that term. More importantly, Mr. Korman is an industry witness, not a legal expert, and is in no position to opine on conclusions of law.

15

and Burnside testified that they did not even read the HUD-1 or surrounding paperwork, which palpably demonstrates that Plaintiffs themselves did not rely on the alleged material omission, and thus reliance cannot be presumed. (Doc. No. 120, Ex. 12, Coleman Dep. 147:4-24; Doc. No. 120, Ex. 14, Burnside Dep. 9:4-9.)[10] Therefore, whether a material omission was made and whether it was justifiably relied upon by a class member presents an individualized inquiry.

Accordingly, Plaintiffs' UTPCPL claim does not meet the requirements of Rule 23 and the proposed class will not be certified on this claim.

## 2. Alleged RICO Violations

Plaintiffs next seek class certification for Defendants' alleged violations of 18 U.S.C. § 1962, claiming that they schemed with title agents to charge and receive fees from homeowners for providing insurance policies "in excess of the amount that the Rate Manual mandates." (Doc. No. 116 at 32.) Plaintiffs further allege that Defendants "willfully blind[ed] themselves to the fraud being perpetrated on Pennsylvania homeowners by Defendants' agents," which is an unconscionable commercial practice in violation of RICO. (Id.) Plaintiffs seek to certify a class of individuals that, because of Defendants' RICO violations, suffered ascertainable losses "as a proximate result." (Id.)

---

[10] Defendants also assert that class certification in this case is inappropriate because of the scienter requirement for liability under the UTPCPL: a plaintiff must establish "fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." (Doc. No. 120 at 66 (quoting 73 Pa.C.S. § 201-2(4)(xxi).) That is, Plaintiffs must establish the state of mind of the actor—here, the agent—to intentionally deceive each class member. Because of the need to individually show the state of mind of each agent, Defendants argue that class treatment is inappropriate due to a failure to satisfy the predominance requirement. (Id.) Because it is clear that Plaintiffs' UTPCPL claim cannot survive class certification because of the need to show justifiable reliance, the Court need not address Defendants' scienter defense.

16

RICO provides a private cause of action to any person injured by someone who commits one of the statute's criminal prohibitions found in § 1962(c).[11] 18 U.S.C § 1964(C); Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 641 (2008). Section 1962(c) encompasses mail and wire fraud, 18 U.S.C. §§ 1341, 1343, which Plaintiffs allege Defendants have committed. See 18 U.S.C. § 1961(1). "To plead a RICO claim under § 1962(c), the plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity . . . plus [(5)] an injury to business or property." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 362, 369 (3d Cir. 2010) (quotations omitted). To establish liability, the "plaintiff must show not only that the racketeering activity was the 'but for' cause of his injury, but that it proximately caused his injury as well." Breslin v. Brainard, 128 F. App'x 237, 240 (3d Cir. 2005) (quoting Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 268 (1992)). RICO demands "some direct relationship between the injury asserted and the injurious conduct alleged." Holmes, 503 U.S. at 268.

"When Rule 23 is the mechanism to redress alleged RICO violations, predominance and commonality are satisfied if *each element* of the alleged RICO violation involves common questions of law and fact capable of proof by evidence common to the class." Reyes, 802 F.3d at 489. "The predominance inquiry seeks to resolve whether there are reliable means of proving classwide injury." Id. (quotations omitted).

Defendants first argue that class certification should be denied because Plaintiffs are incapable of satisfying commonality and predominance, for each member must demonstrate that he or she individually relied on Defendants' alleged misrepresentation. (Doc. No. 120 at 65-66.)

---

[11] 18 U.S.C. § 1962(c) provides as follows:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In response, Plaintiffs asserts that reliance need not be shown when bringing a RICO claim. (Doc. No. 128 at 25.) Plaintiffs point to the United States Supreme Court's holding in Bridge, establishing that a civil RICO claim predicated on mail fraud does not require a showing of first-party reliance, as there is nothing in either the mail fraud statute or in RICO that requires as much. 553 U.S. at 648-49. Plaintiffs also direct the Court to the Third Circuit's holding that, in the class action context, reliance can be inferred under a civil RICO claim so long as there is common evidence of a common scheme. In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig., 795 F.3d 380, 408 (3d Cir. 2015).

The Court agrees with Plaintiffs that RICO generally does not require a showing that a plaintiff relied on a defendant's alleged misrepresentations, for "one can conduct the affairs of a qualifying enterprise through a pattern of [racketeering in violation of RICO] without anyone relying on a fraudulent misrepresentation." Bridge, 553 U.S. at 649. However, the holding in Bridge is not as broad as Plaintiffs read it. As an initial matter, Plaintiffs here *do* allege a RICO claim based on fraudulent misrepresentation. Reliance on that misrepresentation therefore is relevant. Furthermore, while the Supreme Court in Bridge held that showing first-party reliance is not required to state a RICO claim, it cautioned that "none of this is to say that a RICO plaintiff who alleges injury by reason of a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations." 553 U.S. at 657. A demonstration of some form of reliance, whether first- or third-party, is necessary to establish causation, linking the prohibited racketeering activity to the alleged injury. Id.

Several courts within this District have followed this principle of Bridge and have not interpreted it as jettisoning a reliance inquiry altogether under RICO. See Stoneback v. ArtsQuest, Civ. A. No. 12-3287, 2013 WL 3090714, at *15 (E.D. Pa. June 20, 2013) (denying

18

civil RICO class certification because establishing proximate cause required individualized showings of "*someone's*" reliance, and thus predominance was not satisfied); Lynch v. Capital One Bank, N.A., No. Civ. A. 12-922, 2013 WL 2915734, at *3 (E.D. Pa. June 14, 2013) ("Some form of reliance on the defendant's misrepresentation is necessary to properly establish proximate cause for a RICO violation based on mail or wire fraud").

Here, if Plaintiffs seek to impute RICO liability on Defendants, a reliance inquiry is apposite. As noted above, two named Plaintiffs in this case admitted that they had not relied on any alleged misrepresentation in the HUD-1s that they signed when purchasing title insurance from Defendants through title agents. (Doc. No. 120, Ex. 12, Coleman Dep. 147:4-24; Doc. No. 120, Ex. 14, Burnside Dep. 9:4-9.) If representatives of the proposed class themselves cannot demonstrate reliance, the Court is chary to infer reliance on a classwide basis.

Even if Plaintiffs need not show individualized reliance when seeking class certification of their RICO claim, reliance only can be inferred if Plaintiffs can show a common scheme through the use of common evidence. In re Cmty. Bank, 795 F.3d at 408. Plaintiffs have failed to make such a showing. The common evidence on which Plaintiffs rely in asking the Court to infer reliance is the HUD-1 form itself. (Doc. No. 128 at 20-23.) Plaintiffs assert that the HUD-1 forms, which contain overcharged insurance premiums not in accord with the Rate Manual, include misrepresentations common to all class members, and that the overcharges constitute common misappropriation by Defendants and their agents. (Id.) Plaintiffs rely on Community Bank for support that the HUD-1 can suffice as common evidence of a common scheme. See 795 F.3d at 408. However, there is a critical distinction between this case and Community Bank as it relates to using the HUD-1 as common evidence.

In Community Bank, a business offering residential mortgage loans created a scheme to circumvent state law fee caps by "arrang[ing] payments to [banks] to disguise the source of its loan origination services so that fees for those services would appear to be paid solely to the banks." Id. at 385. The HUD-1 signed by each homeowner victimized by the scheme indicated that the borrower paid a fee to the bank for settlement services that was funneled to the mortgage loan business, when in fact that business provided no settlement services. Id. at 385-86. The Third Circuit found that the HUD-1 form constituted common evidence of a common scheme because the mere existence of the form—and its inclusion of *any* service fee which was in fact an illegal kickback—was evidence of fraud, for no services were provided at all. Id. at 403, 408. "Under the facts of [that] case," the HUD-1 provided common evidence because, under federal regulation, the HUD-1 was required to itemize fees for settlement services, and no services were provided for the fees paid. Id. at 403.

In this case, Plaintiffs allege that Defendants schemed to have their title agents overcharge title insurance premiums by not applying a discount to which class members were entitled. This alleged scheme is distinguishable from that in Community Bank. The use of the HUD-1 to perpetuate that alleged scheme is different in kind from the alleged scheme in this case. In Community Bank, the HUD-1 could be used as common evidence because all of the forms included a charge for a nonexistent item—a sham service fee—whatever that charge may have been. Here, Plaintiffs allege that the HUD-1 forms that class members signed contained a misrepresentation in the form of an overcharge. But an individualized inquiry is required to determine if each HUD-1 does in fact contain an overcharge and if the prospective class member was in fact entitled to a discount that was not given. That is, the appearance of a charge on the HUD-1 in Community Bank was common to all class members.

20

The nature of the charge and whether it constitutes an illegal overcharge on the HUD-1's in this case is not common to class members. Indeed, Plaintiffs acknowledge that an overwhelming majority of the HUD-1's in question contain accurate bona fide charges, and a large proportion of the potentially questionable HUD-1's compiled by the Pakter Model are false positives. Thus, the mere existence of the HUD-1 is not evidence of fraud. Individual issues predominate, and the HUD-1 form itself is not common evidence of a common scheme because the alleged misrepresentation on the HUD-1, unlike that in Community Bank, is not a common factor.

Plaintiffs also have failed to demonstrate from the evidence produced during discovery that there was a common scheme perpetrated by Defendants. Plaintiffs "must establish that it is more likely than not that each of the [agents] and the [D]efendants operated" an illegal scheme in violation of RICO. See Reyes, 802 F.3d at 485. Here, Plaintiffs' expert, Mr. Pakter, testified that after applying the Pakter Model's formulas to the Matched Set, only 12% of all title insurance sales possibly could contain illegal overcharges, and manual review of the HUD-1's were needed to verify which sales were in fact overcharges. (Hr'g Tr., 47:16-23, Dec. 8, 2015.) In discovery, Mr. Pakter selected a sample of those possible overcharges and determined that roughly a quarter of them were actual overcharges. Statistically, then, a quarter of the total possible overcharges would be actual overcharges, and therefore the projected rate of actual overcharges in the entire pool of title insurance transactions drops to 3%. (See id. at 45-47; Doc. No. 132 at 9-10.) This rate of overcharge does not establish that it is more likely than not that Defendants concocted a scheme to defraud its insureds through "systemic overcharging," as Plaintiffs allege. See Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc., Civ. A. No. 01-5508, 2003 WL 329145, at *10 (E.D. Pa. Feb. 12, 2003), aff'd, 87 F. App'x 227 (3d Cir.

2003) (holding that a 3% rate of alleged fraud does not amount to a scheme under RICO: "If . . . Defendants had 100 different contracts, the fact that they may have committed fraud as to three of them . . . would be plainly insufficient to constitute a scheme under RICO. If these contracts were the only contracts, or a majority of the total number of contacts, then a RICO scheme may exist.").

Demonstrating a "common plan" given this rate of overcharge requires more, such as showing related "similar results," "victims," or "manner of commission." 87 F. App'x at 232. This requirement is particularly necessary when, out of the three title agents that Plaintiffs examined for overcharges in this case, two of the agents undercharged the insureds far more frequently than they overcharged them. (Doc. No. 132, Ex. 45, Pakter Dep. 74:5-75:10, 79:12-81:5; Ex. 50; Ex. 51.) With undercharge rates projected at roughly two to three times the overcharge rate given the sample set examined by Plaintiffs' expert, Plaintiffs fall short of establishing a common scheme to overcharge title insurance customers. Plaintiffs have not advanced evidence that suggests it is "more likely than not" that Defendants have perpetuated a fraudulent scheme. Accordingly, with a lack of common evidence of a common scheme, individual issues predominate, and class certification as to Plaintiffs' RICO claim is not proper.

Defendants next argue that class certification should be denied because Plaintiffs have failed to provide common evidence that establishes Defendants' intent in committing the alleged RICO violation. (Doc. No. 120 at 70-72.) Defendants note that the underlying RICO violations alleged are mail and wire fraud, 28 U.S.C. §§ 1341, 1343, which are included as prohibited activity in § 1962(c). The fraud violations require a showing of: "(1) a scheme to defraud; (2) use of the mails [or interstate wires] to further that scheme; and (3) fraudulent intent." United States v. Pharis, 298 F.3d 228, 234 (3d Cir. 2002). Defendants assert that Plaintiffs are required

22

to show that Defendants acted with "specific intent" in perpetrating the alleged scheme through the use of the mails and interstate wires, and Plaintiffs are unable to do so with common proof. (Doc. No. 132 at 20.) As such, Defendants aver that class certification should be denied for failure to satisfy Rule 23's commonality and predominance requirements.

To establish fraudulent intent, a requirement to prevail on a claim of mail or wire fraud which serves here as the alleged predicate RICO violation, Plaintiffs must establish that "the [Defendants acted] with specific intent to defraud." United States v. Dobson, 419 F.3d 231, 237 (3d Cir. 2005). "[T]he relevant inquiry is not [only] whether the defendant acted knowingly . . . but whether [it] did so with respect to the overarching fraudulent scheme." Id. Mere evidence of a statement of false fact "is clearly insufficient to prove that the defendants knew that they were involved in a fraudulent scheme." United States v. Pearlstein, 576 F.2d 531, 543 (3d Cir. 1978).

Plaintiffs contend that Defendants have been "willfully blind" to the overcharges made by Defendants' agents, for they chose to ignore the agents' overcharging and allowed the pattern of overcharging to continue. Plaintiffs' theory is that Defendants' willful blindness satisfies the necessary specific intent to defraud as required to state a claim of mail or wire fraud. There are two problems with Plaintiffs' theory. First, as a practical matter, Plaintiffs concede in advancing this theory that Defendants did not actively concoct a fraudulent scheme with its agents to overcharge its customers. Second, as a legal matter, Plaintiffs are incorrect that "willful blindness" automatically satisfies the specific intent element of mail or wire fraud. The Third Circuit has repeatedly held that in the mail and wire fraud context, a claim of "willful blindness" does not lower the burden of establishing that the defendant "acted knowingly and with an intent to defraud." United States v. Tai, 750 F.3d 309, 315 (3d Cir. 2014); see also United States v. Diamond, 322 F. App'x 255, 257 (3d Cir. 2009) (holding that a claim of willful blindness must

23

be accompanied with proof of "subjective awareness" in order to satisfy the specific intent element). Plaintiffs therefore must demonstrate that Defendants had a specific intent to defraud their title insurance customers through the mails or interstate wires, or were "subjectively aware" of their agents' fraud, in order for Plaintiffs' RICO claim to survive.

Even if Plaintiffs' allegation of willful blindness could amount to specific intent to perpetuate a mail and wire fraud scheme, Plaintiffs have not adduced evidence that would support the claim that, by a preponderance of the evidence, Defendants were willfully blind. Plaintiffs insist that they have common evidence that will be able to prove Defendants' willful blindness. (Doc. No. 143 at 10.) Plaintiffs assert that Defendants required agents to provide all information regarding insurance transactions, which were then entered into Defendants' databases. (Doc. No. 128, Exs. 5-8 (Dep. Trs. of Verdone, Hogan, Asquith, Kulig).) Next, Defendants reviewed the information received by the agents to ensure that they had received their share of the proceeds of the transaction. (Id.) Plaintiffs conjecture that because Defendants did not double-check the work of the agents "to make sure that [they] were complying with the applicable Rate Manuals," they therefore willfully blinded themselves to the allegedly systemic overcharging by their agents. (Doc. No. 143 at 11-12.)

In further support of this argument, Plaintiffs claim that Defendants employed an inadequate audit system that, in the case of Plaintiffs Schwartz, did not uncover an overcharge "until four or five years after it occurred," and even then failed to notify Plaintiffs of the overcharge and ensure that the overcharging agent made a refund to them. (Id. at 12.) Plaintiffs maintain that this audit system involves auditors who are not highly qualified, perform minimal rate testing, and do not provide Defendants with enough information to make certain that Defendants and their agents are in compliance with the rate manual. (Id.; Doc. No. 128, Ex. 11,

24

Dep. of Hart.) If an overcharge is detected, Defendants do request that the overcharging agent refund the customer (Doc. No. 127, Exs. 5, 6 (Deps. of Verdone, Hogan)), or they refund it themselves (id., Ex. 6, Dep. Tr. of Hogan 81:14-20). This audit system, argue Plaintiffs, is common evidence that Defendants have willfully blinded themselves to possible overcharges made by their agents.

Plaintiffs' proffered common evidence is not capable of demonstrating Defendants' willful blindness on a classwide basis. Defendants' industry expert, Mr. Korman, testified that there is no incentive to overcharge customers: Defendants and their agents risk losing their licenses if they are found to be charging against the mandates of the Rate Manual, and because they cannot compete on the market for price, they must compete on service. (Doc. No. 144, Ex. 55, Dep. Tr. of Korman at 115-16.) Thus, Defendants have every reason to ensure, to the best of their ability, compliance with the Rate Manual. Moreover, Defendants' expert and several deposed title agents testified that Defendants' review and auditing practices are on par with or surpass the industry standard for auditing, support, and supervision of their agents. (Doc. No 120, Ex. 5 at 14, Exs. 8-11.) Indeed, Defendants have a robust system of selecting agents, supervising agents and keeping them informed of any Rate Manual changes, providing agents with annual seminars that offer continuing education credits, conducting annual reviews of agent operations, providing legal support, and auditing agents to ensure that the correct rates are charged. (Doc. No. 120 at 26-32.) Plaintiffs admit that the audit system catches overcharges. (Doc. No. 143 ("Defendant discovered the overcharging").) Finally, the low projected rate of overcharges is indicative of an effective oversight system.

Under all of these circumstances, it is *not* "more likely than not" that Defendants designed an illegal scheme to defraud insurance customers by denying them discount rates to

which they were entitled. Plaintiffs have fallen short of establishing common evidence that could demonstrate Defendants' willful blindness to the alleged systemic overcharging by its agents. If anything, it seems more likely than not, given the evidence presented, that the low number of overcharges resulted from error or isolated mistake, not any violation of RICO. From a class perspective, Plaintiffs have not alleged common evidence that could establish Defendants' specific intent to defraud the class or their willful blindness to an ongoing fraudulent scheme.

In the absence of common evidence of a common scheme, individual issues predominate, and class certification will be denied on Plaintiffs' RICO claim.

## B. Ascertainability Is Not Satisfied

The parties next disagree about whether Plaintiffs' proposed class satisfies the Third Circuit's ascertainability standard for class certification. The Third Circuit describes "[c]lass ascertainability [as] an essential prerequisite of a class action . . . under Rule 23(b)(3)." Carerra, 727 F.3d at 306 (quotations omitted). Ascertainability is a critical factor in deciding whether to certify a class for the following reasons:

First, at the commencement of a class action, ascertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of a class. Second, it ensures that a defendant's rights are protected by the class action mechanism. Third, it ensures that the parties can identity class members in a manner consistent with the efficiencies of a class action.

Id. at 307. Because "the class action device saves the resources of both the courts and the parties," Falcon, 457 U.S. at 155, ascertainability ensures that the class is determined "in an economical and administratively feasible manner," Carrera, 727 F.3d at 307. Plaintiffs must show that "the class is currently and readily ascertainable based on objective criteria." Id. at 306. Therefore, the Court must determine if members of the proposed class can be identified "without extensive and individualized fact-finding or mini-trials." Marcus, 687 F.3d at 594.

Defendants correctly note that the Pakter Model does not meet the ascertainability criteria. Class members cannot be readily identified by the Matched Set—which serves as the foundation of the Pakter Model—because the Pakter Model's formulas generated false positives at a rate of 78%. (Hr'g Tr., 57:4-19, Dec. 8, 215.) "[W]here nothing in company databases show[] or could show whether individuals should be included in the proposed class, the class definition fails." Marcus, 687 F.3d at 593. Neither the Matched Set, which is a combined dataset of Defendants' databases, nor the formulas applied to it under the Pakter Model show which individuals should be included in the proposed class. Instead, the Pakter Model must be supplemented by manual, file-by-file review. Each identified potential class member—whether identified correctly or, more likely, incorrectly—must have his or her HUD-1 individually and manually examined to determine if that member was entitled to a discount, what that discount would be, and if that discount was applied. (Doc. No. 128 at 16-19.)

Plaintiffs rely on a Third Circuit holding that "the need to review individual files to identify its members [is] not [a] reason[] to deny class certification." Byrd v. Aaron's Inc., 784 F.3d 154, 170 (3d Cir. 2015). That case involved a classwide claim of laptop renters against a rental company for illegally using spyware to monitor the renters' computer activity. In Byrd, Plaintiffs had access to the identity of all potential class members because the rental company kept a file of all 895 rented laptops that had been monitored illegally through the spyware. Id. at 159-60. Thus, a quick review of the file could confirm the identity of the person who rented the affected computer. Here, however, a more in-depth analysis of individual files is required to determine if a homeowner properly belongs in the proposed class and was entitled, and in fact denied, a discount on an insurance policy. Furthermore, unlike Byrd, these files are *not* currently available or readily accessible to either party, and Byrd did not abrogate the requirement that

27

under the ascertainability standard, "the members of a class [must be] identifiable at the moment of certification." Shelton v. Bledsoe, 775 F.3d 554, 559 (3d Cir. 2015). Plaintiffs confirm that they have no means of knowing who would be in the proposed class at this time. (Hr'g Tr., 168:22-23, Dec. 8, 2015.) Therefore, the file-by-file review here amounts to a "mini-trial" and "individualized fact-finding" that undermines ascertainability and makes class treatment inappropriate.

Moreover, Plaintiffs' proposed method of identifying class members is not reliable or administratively feasible. See Carrera, 727 F.3d at 307. Given the enormous percentage of false positives that are generated by the Pakter Model, it can hardly be said to constitute a reliable, administratively feasible means of identifying class members. To obtain the HUD-1's necessary to confirm that potential overcharges identified by the Pakter Model are in fact overcharges and not false positives, third-party subpoenas to individual agents would be required. These agents store their HUD-1 forms in a variety of ways—many of them at an off-site location. It could cost upwards of $100 to retrieve a single form. (Doc. No. 120, Ex. 9, Dec. of Sokolow at 2.) Moreover, over three-quarters of the HUD-1's selected for manual review by the Pakter Model are projected to be false positives, and thus retrieving these HUD-1's to confirm that a large percentage are in fact false positives is not an economically or administratively feasible—or reliable—method of identifying class members.

Plaintiffs are correct that at the class certification stage, they need not identify every single member of the proposed class. See Byrd, 784 F.3d at 170. However, Plaintiffs must demonstrate a readily available mechanism to reliably and feasibly identify members, and they have not done so. Accordingly, Plaintiffs have failed to demonstrate that they can satisfy the requirement of ascertainability.

## V. CONCLUSION

Plaintiffs have not satisfied the commonality or predominance requirements of Federal Rule of Civil Procedure 23, nor have they met the Third Circuit's ascertainability requirement for class certification. For the foregoing reasons, Plaintiffs' Motion to Certify a Class for both their UPTCPL and RICO claims will be denied. An appropriate Order follows.